[No. 27462. *En Banc.* September 28, 1939.]

MARY LAMPE, *a Minor, by Annie Lampe, her Guardian ad Litem, et al., Appellants,* v. A. J. TYRELL *et al., Respondents.*[1]

*S. A. Gagliardi,* for appellants.

*Robert E. Evans* and *Hayden, Metzger & Blair,* for respondents.

JEFFERS, J.—This action was brought by Mary Lampe, by her guardian *ad litem,* Annie Lampe; Anton Lampe and Annie Lampe, husband and wife; Elsie

[1]Reported in 94 P. (2d) 193.

Hauge, by her guardian *ad litem,* Jennie Hauge; Andy Hauge and Jennie Hauge, husband and wife; Mildred Walentiny, by her guardian *ad litem,* Theresa Walentiny; Mathias Walentiny and Theresa Walentiny, husband and wife; against A. J. Tyrell and Joe Tyrell, to recover for injuries claimed to have been sustained by Mary Lampe, Elsie Hauge, and Mildred Walentiny, as the result of a collision between a car in which they were riding and a parked car, the car in which plaintiffs were riding being driven by defendant Joe Tyrell and owned by his father, A. J. Tyrell.

A demurrer to plaintiffs' amended complaint, interposed by defendant A. J. Tyrell, having been sustained, and plaintiffs having elected to stand on their amended complaint, the cause proceeded to trial against Joe Tyrell alone. At the close of plaintiffs' case, the court granted a motion for nonsuit made by defendant Joe Tyrell and thereafter entered a judgment of dismissal on the merits as to both defendants. A motion for new trial was timely made and denied, and this appeal followed.

Appellants contend the court erred (1) in sustaining the demurrer of respondent A. J. Tyrell and dismissing him from the case; (2) in granting a nonsuit at the conclusion of appellants' evidence; and (3) in denying the motion for new trial, and entering a judgment of dismissal.

The facts in this case, in so far as material to a decision of what we deem the vital questions in the case, may be stated as follows: On May 10, 1934, twenty-one girls from the senior class of St. Leo's high school, in Tacoma, together with two chaperons, went out to Lake Killarney to spend the week-end. Among these girls were appellants Mary Lampe, Elsie Hauge, and Mildred Walentiny, who at that time were about seventeen years of age. The next day, shortly

before supper time, Dale Forkenbrock and Mark Lowell drove out to the girls' camp in Dale's Austin car. These boys had supper at the camp, and sometime thereafter, respondent Joe Tyrell, driving his father's car, and accompanied by John Rhea, Phil Bartinetti, and Glen Collins, drove into the camp. These boys were all high school boys, and about the same age as the girls, some of whom they knew and some of whom they did not know.

These young folks did the things young people usually do at picnics, but eventually it was suggested by someone that they have a wiener and marshmallow roast. This suggestion led to an inspection of the supplies, and it was found there were not enough wieners and marshmallows for the crowd. It was suggested that someone would have to go into Tacoma to get some wieners and marshmallows.

During this conversation, the crowd was scattered around, some of them being on the lake, some of them in the cabin, where the conversation, or at least part of it, seems to have taken place, and some outside. During the conversation, someone suggested that they take up a collection to get the wieners and marshmallows, and apparently this was done, but none of the appellants knew who took up the collection, who contributed, other than that they thought most of the girls who had some change contributed, how much was contributed, or who got the money. It does, however, appear that John Rhea had the money at the time the six young people started for Tacoma. All of these appellants testified that the collection was taken up for the sole purpose of getting the wieners and marshmallows, and it does not appear from the testimony of any of the appellants, or any other witness except Phil Bartinetti, that anything was said about

any part of this money being used to pay the expense of transportation to Tacoma and back.

About this time, someone suggested that Dale Forkenbrock take his car and go after the supplies, but it appears that Dale's car, being an Austin, was small, and as he had apparently already been into Tacoma once that afternoon, he did not want to go. Joe Tyrell then said he would take his car and go, but that he did not want to go alone, and would not go unless some of the girls went along for company. None of the appellants seemed to know just how it happened that they were the ones who finally went, except that it appears that some of the girls were engaged in other activities, some of them had work to do around the camp, and it was suggested that appellants go with Joe for company, so they went. It does not appear that Joe Tyrell at any time talked personally to any of the appellants about the trip, or that at any time it was discussed with them as to what was to be done after they got to Tacoma, or that appellants were to take any part in purchasing the supplies.

Nothing appears in the testimony to indicate that anyone other than respondent was to have any control, either directly or indirectly, in the operation of the car. It does not appear from the testimony that respondent expressly invited any one of these appellants to accompany him, but it does appear from all the testimony that respondent said he would take his car and go, if some of them would go with him for company, and so eventually appellants went.

As an example of the testimony of appellants, Mildred Walentiny testified that Joe offered to go, but did not want to go alone; that some of the boys offered to go, and "we went with him because he did not want to go alone—we went along for company." Appellant Elsie Hauge testified that Joe Tyrell said he

would go, but would not go alone; that he wanted someone to go with him for company; that nobody designated them to go, but that the girls went because Joe wanted some of them to go for company, and that was the reason they went. Appellant Mary Lampe did not know who asked her to go, did not remember seeing the collection taken up, and did not remember who did any of the talking or what was said, except that they were going to take up a collection. She did not remember whether she contributed or not.

Phil Bartinetti testified that he went because Joe asked him to go, and that was the only reason he went. During his examination, on three different occasions he testified the collection was taken up for the purpose of getting wieners and marshmallows and for no other purpose, but finally, in answer to a question by Mr. Gagliardi, he testified that they were to use some of the money to buy gas and oil. On cross-examination by Mr. Evans, he admitted that, during the conversation, he had heard no one say anything about buying gas and oil, but that, after the collection was taken, and just before they got in the car, John and Joe said they were to buy gas and oil with some of the money. He further testified that no gas or oil was purchased, and, on being further interrogated by Mr. Evans as to whether he had stated in Mr. Evans' office that nothing had been said at any time about gas and oil, the witness said he did not remember. On being further questioned by Mr. Evans as to whether or not a short time before, in the hall, the witness had said he had lied to Mr. Evans in his office, the witness said he did not remember, but, referring to that occasion, further testified: "I might have made a lot of lies."

Dale Forkenbrock testified that Joe said he would take his car and go in, and Rhea and Bartinetti were

going with him; that they asked if anybody else wanted to go along, and it was finally decided three of the girls would go; that they did not ask any definite girl—*they just asked who would like to go along, and these girls said they would be the ones that would like to go.* In answer to a question by Mr. Gagliardi, "Who said that?" the witness replied, *"The boys asked the girls who would like to go along."*

Appellants contend that the trial court erred in ruling that appellants had failed to prove a joint adventure, and in taking the case away from the jury and deciding, as a matter of law, that the appellants were not entitled to recover.

Appellants seem to argue that, unless it appears that the relationship was that of host and guest, or licensor and licensee, the relationship of the parties should have been submitted to the jury, and thus to argue, inferentially at least, that possibly there could have been, under the testimony in this case, some relationship other than that of joint adventurer, host and guest, or licensor and licensee. We think, under the testimony, the status of the parties hereto was either *that of joint adventurer, host and guest, or licensor and licensee.* Counsel for appellants does not suggest what other relationship could have existed. Certainly, they were not passengers for hire; neither were they trespassers. However, later on in his brief, counsel for appellants flatly contends the facts proven bring this case squarely within the definition of joint adventurer.

The trial court held the status of the parties was not that of joint adventurer, but was that of either host and guest or licensor and licensee, and, there being no evidence that the accident was intentional on the part of respondent, there could be no recovery herein.

The question of whether or not the relation-

ship of joint adventurer has been established is not always an easy one to determine. There are many decisions from this court on this question, and in some of the cases it was held that the relationship had been established; in others not. The facts in some of these cases are such as not to be easily distinguished. However, we believe that the relationship of joint adventurer is fundamentally based upon certain principles, and that the court has endeavored to apply those principles to the facts in the different cases.

In the following cases, we held the testimony sufficient to take the case to the jury on the question of joint adventure: *Masterson v. Leonard,* 116 Wash. 551, 200 Pac. 320; *Hurley v. Spokane,* 126 Wash. 213, 217 Pac. 1004; *Jensen v. Chicago, M. & St. P. R. Co.,* 133 Wash. 208, 233 Pac. 635; *O'Brien v. Woldson,* 149 Wash. 192, 270 Pac. 304, 62 A. L. R. 436; *Lloyd v. Mowery,* 158 Wash. 341, 290 Pac. 710; *White v. Stanley,* 169 Wash. 342, 13 P. (2d) 457; *Bates v. Tirk,* 177 Wash. 286, 31 P. (2d) 525; *Forman v. Shields,* 183 Wash. 333, 48 P. (2d) 599; *Potter v. Jaurez,* 189 Wash. 476, 66 P. (2d) 290; *Duvall v. Pioneer Sand & Gravel Co.,* 191 Wash. 417, 71 P. (2d) 567; *DeNune v. Tibbitts,* 192 Wash. 279, 73 P. (2d) 521; and in the following cases, we held the testimony was not sufficient to establish such relationship: *State ex rel. Ratliffe v. Superior Court,* 108 Wash. 443, 184 Pac. 348; *Rosenstrom v. North Bend Stage Line,* 154 Wash. 57, 280 Pac. 932; *Sanderson v. Hartford Eastern R. Co.,* 159 Wash. 472, 294 Pac. 241; *Colvin v. Simonson,* 170 Wash. 341, 16 P. (2d) 839; *Eubanks v. Kielsmeier,* 171 Wash. 484, 18 P. (2d) 48; *Pickering v. Stearns,* 182 Wash. 234, 46 P. (2d) 394; *Syverson v. Berg,* 194 Wash. 86, 77 P. (2d) 382.

The first case to which we desire to refer is that of *State ex rel. Ratliffe v. Superior Court, supra,* as this

case is cited in many cases and seems to have been the pioneer in this state in announcing the principles underlying this relationship. In the cited case we stated:

"The courts and authorities have not yet laid down any very certain definition of a joint adventure, nor have they established any very fixed or certain boundaries thereof, but generally they have been content to determine whether the given or conceded facts in a particular case constitute the relationship of joint adventurers or copartners. Generally speaking, the authorities seem to hold that a joint adventure very closely resembles a copartnership, and that the rules of law governing the latter are generally applicable to the former. It is conceded that a joint adventure *creates a close and even fiduciary relationship between the parties,* and that whether an instrument establishes the relationship of landlord and tenant or joint adventurers or copartners is to be ascertained from the contract." (Italics ours.)

In *Hurley v. Spokane, supra,* it does not appear that there was any agreement between the parties, but it does appear that the occupants of the car were brother and sister, using the car of their father for a common purpose at the time of the accident. The decision seems to have been based upon the rule announced in 20 R. C. L. 149, which is to the effect that, if two or more persons unite in the joint prosecution of a common purpose, under such circumstances that each has authority, express or implied, to act for all in respect to the control of the means or agencies employed to execute such common purpose, the negligence of one in the management thereof will be imputed to the others.

In *Masterson v. Leonard, supra,* where it appears that two boys were riding a bicycle, owned by the father of one of them, delivering papers on a route belonging to one boy, the other boy going along for the

purpose of learning the route so that he could substitute for the boy who owned the route, we held there was sufficient evidence to go to the jury on the question of joint adventure, saying:

"We are of the opinion, in view of the ownership of the bicycle, the general possession of and control over it by Frank, the acquiescing by him in the temporary control over it by Edward for the purpose of conveying them both on this hazardous journey, which we think was their common enterprise or adventure, that the trial court did not err in telling the jury, in effect, that whatever negligence Edward was guilty of, in carrying out this their joint enterprise or adventure, was attributable to Frank and became, in law, his negligence."

No reference is made in this opinion to any contractual relation.

In *Jensen v. Chicago, M. & St. P. R. Co., supra,* there was evidence of an agreement by the parties to enter into an undertaking in which the parties had a common interest, and to which they were all to contribute.

In *O'Brien v. Woldson, supra,* the testimony shows the parties left Spokane on a pleasure trip to Portland and Seattle. Mrs. Woldson was to furnish the automobile, and Mrs. O'Brien was to pay for the gasoline. In this case, we stated:

"For present purposes it is sufficiently accurate to say that the relations of joint adventurers as between themselves are governed practically by the same rules that govern partners."

*Rosenstrom v. North Bend Stage Line, supra,* is cited by counsel for each of the parties hereto, and is referred to in practically all of the cases subsequently decided by this court on this question. In the cited case, respondent and one Baffaro were students at Renton high school and members of the football team. On the day of the accident, the members of the foot-

ball team were excused at three o'clock, in order that they might engage in football practice. When respondent and Baffaro went to their lockers, each discovered he had left the key to his locker at home. Baffaro had driven a car to school, which was parked on the grounds. When Baffaro discovered his key was at home, he stated that he was going after it, and that he would take respondent along and drive him to his home so he could get his key. It was while on this mission that the accident happened. This court held the parties were not engaged in a joint adventure, and in the course of the opinion stated:

"The relation, as a legal concept cognizable by the courts, must have its origin in contract.

"There must be an agreement to enter into an undertaking in the objects or purposes of which the parties to the agreement have a community of interest and a common purpose in its performance. Necessarily, the agreement presupposes that each of the parties has an equal right to a voice in the manner of its performance, and an equal right of control over the agencies used in its performance. One or more of the parties may, of course, intrust performance to another or others, but this involves only the law of agency."

In *Lloyd v. Mowery, supra,* the evidence is to the effect that there was an agreement to engage in a joint adventure, and that, for the purpose of carrying out the common purpose, one of the parties was to furnish the car and the others were to contribute to the expenses of the trip. The *Rosenstrom* case is not referred to, and the decision is based upon the rule announced in *O'Brien v. Woldson, supra.*

The testimony in *White v. Stanley, supra,* is to the effect that the parties were going on a fishing trip, and the night before talked the matter over. While there was no express agreement as to just what each one was to contribute towards the expedition, it ap-

pears that Stanley furnished the car and White contributed to the expenses of the trip. In the cited case, we referred to *Masterson v. Leonard,* and *Hurley v. Spokane, supra,* and apparently upon the authority of those two cases, stated:

"Many times, an express or implied agreement to share the expense is one of the elements constituting a joint adventure, but it is not always a necessary element."

We stated, in *Sanderson v. Hartford Eastern R. Co., supra:*

"The evidence before us fails to disclose the elements of a 'joint adventure,' or any facts which constituted Samuel Sanderson in law respondent's agent for the purpose of driving Samuel's automobile. In the suggestion made by respondent's son that respondent ride home in the son's car, and in the acceptance of this invitation by respondent, it is clear that respondent entered upon this journey as a mere invitee, and not as a joint adventurer."

In *Colvin v. Simonson, supra,* where it appears that, at the time of the accident, the father of respondent, as was the usual practice, was taking respondent's brother to school, and was then to take respondent on to her work, we stated:

"In our opinion, the record is lacking in evidence upon which to predicate a finding that there was a relationship of joint adventurers between respondent and her father. Mere evidence that a passenger is in the habit of making certain trips at regular intervals is, in itself, insufficient upon which to predicate the existence of a joint venture."

In the case of *Eubanks v. Kielsmeier, supra,* the facts are that appellants Kielsmeier were the owners of an automobile, and on the day of the accident, Mrs. Kielsmeier, together with respondent Dorothy Eubanks, a minor, her mother, and a Mrs. Harter, made a

trip to the city of Yakima to do some shopping and to attend a luncheon to be given by a mutual friend. Sometime prior to the day of the accident, Mrs. Eubanks and Mrs. Harter had discussed the expected trip to Yakima and had probably agreed that between them they would pay for the gas and oil used on the trip. About the time they started on the trip, either Mrs. Eubanks or Mrs. Harter suggested that they drive up to a gas station and procure gas and oil. The offer was declined by Mr. Kielsmeier, who was present at that time. The ladies did their shopping and attended the luncheon, and on the return trip the accident occurred, resulting in injuries to Mrs. Eubanks and her daughter Dorothy. In the cited case, we stated:

"There is nothing in this evidence, in our opinion, from which any reasonable conclusion or inference can be drawn that there was a joint adventure between the parties . . . The preliminary arrangement between Mrs. Eubanks and Mrs. Harter, relative to paying for the gasoline and oil on the Yakima trip, if it is to be considered seriously at all, was never communicated to the appellants. *In any event, there was never a consummation of the prospective arrangement* . . .

"But even if the gasoline and oil had been purchased by the lady companions, that of itself would not have established a joint adventure . . . The purchase by a companion of a trifling amount of gasoline, *in the absence of any agreement by the parties to share the expenses of a trip, does not ipso facto convert the amenities of a friendly host into the obligations of a joint adventurer.* To hold otherwise would compel every host to dilute his hospitality and season it with the flavor of a bargain. . . .

"The parties may have made the trip to Yakima each having a like purpose in mind, but that fact alone does not constitute a joint adventure. A host and guest may, and often do, have a common objective, in point of time or place, yet their relationship as such is not thereby necessarily changed. . . . We have held

that a joint adventure, as a legal concept, must have its origin in contract, that the agreement presupposes that each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in its performance. . . .

"The respondents did not testify, or by slightest suggestion assume to say, that there was any agreement of any kind whatever whereby the parties were to share the expenses or to exercise joint control over the automobile. . . .

"The respondents were guests, not joint adventurers." (Italics ours.)

In *Bates v. Tirk, supra,* the testimony shows that one Royer Bogenreif was a friend of the Bates family, and had on frequent occasions been out riding, in the Bates family car, with various members of the family, and on such occasions usually did the driving. On the day of the accident, there was to be a football game at the school grounds, and in the forenoon, Bogenreif went to the Bates home, with the intention of taking respondent, Dorothy Bates, and her sister to the football game, provided they were allowed to use the Bates car. Permission was given by respondent's father to use the car, and it seems to have been understood that Bogenreif was to do the driving. Borgenreif replenished the car with gasoline, purchased by himself, and the three young people went to the football game. It was on the return trip home that the accident in which respondent was injured happened. We held the undertaking was a joint adventure.

We held, in *Pickering v. Stearns, supra,* that, at the time of the accident, the parties were not engaged in a joint adventure, and therein stated:

"We find in the record nothing which supports respondent's contention that she bore the relation of joint adventurer. She was not a student at the junior

college, nor does it appear that she made any contribution to the expense of the journey. We are of the opinion that John Oldfield and Ed Stearns were joint adventurers, but respondent was an invited guest of the joint adventure, and bore the relation of guest to both Oldfield and Stearns."

It does not appear that respondent had been invited to make the trip by Ed Stearns, the driver of the car, but had been invited by John Oldfield, who contributed five gallons of gasoline towards the expense of the journey.

In *Forman v. Shields, supra,* Gordon Shields had obtained permission of his father (appellant) to use the family car to take a group of boys on a class picnic to Lake Samish. Among these boys was respondent, William Forman. The night before the picnic, the boys decorated the car, each contributing a small amount towards the decorations. It was also agreed that respondent and two of the other boys should each buy a gallon of gas for the trip. No gas was ever purchased by these boys, and respondent's explanation of his failure so to do was that settlement was to have been made after the picnic. We held the facts sufficient to take the case to the jury on the question of joint adventure.

In *Potter v. Jaurez, supra,* the testimony shows that respondent desired to make the trip from Seattle to Rockport and return, and pursuant to such desire, she talked the matter over with appellant Mrs. Jaurez, and it was agreed appellants would take respondent to Rockport, and that respondent would pay her share of the expenses. We stated that the jury could hardly do otherwise than find that a complete understanding was then arrived at by the two ladies, to the effect that the respondent should pay her share of the expenses.

In *Duvall v. Pioneer Sand & Gravel Co., supra,* we stated that all the elements of joint adventure, as enumerated in the *Rosenstrom* case, *supra,* sufficiently appeared to make the question one for the jury. While it appears that all the ladies who were riding in the car at the time of the accident were going to Tacoma for the purpose of putting on some lodge work, it does not appear that there was any agreement or understanding that the ladies, other than the owner of the car, would in any way contribute to, or share in, the expense of the trip, nor is there anything in the testimony to indicate that the ladies, other than the owner of the car, were to have a voice in the manner of operation or control of the automobile.

In the case of *Syverson v. Berg, supra,* the sole question was whether the trial court, as a matter of law, should have held that respondent Mrs. Syverson was an invited guest, under Laws of 1933, chapter 18, p. 145. Respondent's minor daughter and appellant, Rodney Berg, had been friends for some time, and about a year prior to the accident, appellant had invited respondent's daughter to accompany him on an automobile trip to Pullman, to attend a dance. As the trip involved an overnight absence, respondent would not allow her daughter to go. At the time of the trip in question, appellant again invited respondent's daughter to accompany him to Pullman, to attend a military ball. The mother again refused to allow the daughter to go, and at first refused to accompany the young people as chaperon, but about a week prior to the ball, respondent relented and granted permission to the young people to make the trip, respondent to go along as chaperon, her only purpose being to make the trip possible for her daughter and appellant. The opinion states:

"This was a purely social automobile trip. It was not taken in expectation of material gain. To hold that a mother acting as a chaperon to her daughter for the sake of propriety is not within the status of an invited guest—there is no evidence or claim of any monetary consideration either accruing or promised to the appellant as a result of this trip—would so misinterpret the statute as to divest it of force and defeat the clearly declared intention of the legislature to deny recovery, as against the owner or operator of the automobile, to a guest or licensee *where no business advantage or material consideration accrued to the host* in the transportation resulting in the injury. . . .

"This is not a case of an agreement to share expenses and where, by reason of such an agreement, a material benefit is conferred upon the driver." (Italics ours.)

Since the decision in the *Ratliffe* case, *supra,* to which reference is made in the *Rosenstrom* case, this court has recognized the rule that the relationship of joint adventurer must have its origin in contract. Appellants recognize this rule, but say that "at no time has it been held that it was a contract clothed with all the definitions and necessities of a contract."

While it may be that, in some of the cases, such as *Hurley v. Spokane,* and *Duvall v. Pioneer Sand & Gravel Co., supra,* there does not seem to be much in the testimony upon which to base any contractual relation, still we are of the opinion it has not been the intention of this court to depart from the rule announced in the *Rosenstrom* case, and we again affirm the rule there announced, and now state that the relationship of joint adventurer must be founded on contract, and that, before such relationship can be established, it must appear from the testimony that there was an agreement between the parties to enter into an undertaking, in the objects or purposes of which

the parties to the agreement have a community of interest.

Such an agreement presupposes that each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in its performance. We cannot believe that this status can be established by mere loose statements, with no thought of any contractual obligation, or that it can be formed by the mere purchasing of some item, such as gas or oil, there having been no previous agreement or understanding so to do. Neither do we believe that a common purpose is sufficient in itself to form this relationship, there having been no previous agreement to carry out the common purpose. The relationship of joint adventurer is a serious matter, and it should not be held that the parties thereto have assumed the liabilities attached to such an undertaking, without some definite indication of their intention so to do.

If this relationship is to find any basis in contract, then certainly there must be present some of the elements of a contract before it can be contended such a relationship has been established. It is so obvious as to be almost inescapable that there must be an agreement in order that at least two elements necessary to this relationship be established, or implied therefrom. We know, as a practical proposition, that, when several parties are riding in a car, regardless of what their purpose may be, the owner of the car usually drives and controls the car. Apparently, the courts have recognized this fact; hence, the only theory on which one not such a driver or operator may be said to have an equal voice in the manner of its performance and an equal right of control over the car, is that each is engaged in the performance of the plans which *all have agreed upon,* and which are as personal to

one as to the other. Surely, before it can be said that parties other than the owner of a car have an equal voice in its operation and control, there must be some contribution on their part to the enterprise, which will be of mutual benefit to the owner of the car, as well as to themselves, and which will constitute a consideration for their right to an equal voice in the manner of performance and an equal right of control over the car.

Viewing the testimony in the instant case with the rule in mind just announced, we are clearly of the opinion that appellants and respondent were not joint adventurers. There was no agreement, either express or implied, between appellants and respondent, shown by the testimony; neither does it appear that appellants contributed anything to the trip from which respondent would have benefited, other than the pleasure of their company. It does not appear that it was necessary for appellants to go, as John Rhea had the money with which to buy the wieners and marshmallows, and it further appears from the testimony of appellants that they went along as company, and for that reason only.

Was the relation of appellants and respondent that of host and guest, or licensor and licensee?

Laws of 1933, chapter 18, p. 145, § 1, provides:

"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee without payment for such transportation shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator."

There is no claim here, nor does the testimony show, that the accident in which appellants were injured was intentional on the part of respondent.

We think, under a fair interpretation of the testimony in this case, appellants were respondent's guests. It is claimed the testimony does not show that appellants were invited guests. It is true it does not appear that respondent specifically asked each one of the appellants to go into Tacoma with him, but we think an invitation may be given impliedly as well as expressly. Respondent stated that he would take his car and go in after the supplies, but would not go unless some of the girls went along for company, and so, as testified by them, they went along for company; in other words, these appellants accepted the implied invitation of respondent, extended to any of the girls that might desire to go along. We believe appellants were invited guests of respondent, under our decisions in *Eubanks v. Kielsmeier* and *Syverson v. Berg, supra.* See 4 Blashfield Cyc. of Automobile Law and Practice, 79, § 2292.

In view of the conclusion reached by us on the question considered, it becomes unnecessary to discuss the other errors assigned by appellants.

We are therefore of the opinion the court did not err in granting respondent's motion for nonsuit at the conclusion of appellants' evidence and entering a judgment of dismissal.

The judgment is affirmed.

ALL CONCUR.