[No. 29132.   *En Banc.*   January 21, 1944.]

ELNA G. PRIESTLEY, *Respondent,* v. EMIL PETERSON *et al.,*
*Appellants.*[1]

[1]Reported in 145 P. (2d) 253.

*Weter, Roberts & Shefelman* and *Wayne C. Booth,* for appellant.

*H. A. Martin,* for respondent.

BEALS, J.—The persons concerned in the operations which resulted in this litigation are:

Apex Gold Mines, Inc., a Washington corporation (herein referred to as Apex), having a capital stock of ten million shares, which in 1940 was the owner of a lease on a gold

mine located in the Cascade mountain range, which lease at that time had approximately ten years to run.

William J. Priestley and Elna G. Priestley, who in 1937 were husband and wife, and who, October 29th of that year, entered into an agreement for the purpose of settling, as between themselves, their property rights. At the time of the making of the agreement referred to, Mr. and Mrs. Priestley owned a large amount of the capital stock of Apex Gold Mines, Inc., their joint holdings aggregating 4,450,000 shares.

J. G. Priestley, a brother of William J. Priestley, a resident of the city of Seattle.

Reeves Aylmore, an attorney at law practicing in Seattle.

Emil Peterson, who was then also a resident of Seattle.

The agreement above referred to, entered into by Mr. and Mrs. William J. Priestley, after reciting that the parties thereto were husband and wife, and that differences had arisen between them which rendered it mutually advantageous to settle their property rights, continued by describing nine parcels of real estate in King county and a group of mining claims owned by the parties, and stated that they also owned a large amount of stock in Apex, some of which stood in Mr. Priestley's name, other shares standing in the name of his wife. The parties then stated their agreement that

" . . . for the purpose of this settlement the parties agree that a half (½) interest in all of the property owned or acquired by the parties hereto shall be fixed at Thirty-five Thousand ($35,000.00) Dollars."

The agreement then continues:

"Now Therefore, second party shall, upon the payments being made as hereinafter provided, convey to first party all her interest in and to all of the above described property and any other property belonging to the parties whether mentioned or not, and in consideration thereof, first party shall pay second party the sum of Thirty-five Thousand ($35,000.00) Dollars, as hereinafter provided.

"First party shall pay to second party the sum of One Thousand ($1000.00) Dollars in cash and the further sum

of One Hundred and Twenty-five ($125.00) Dollars per month beginning December 1, 1937, all payments to apply upon the said sum of Thirty-five Thousand ($35,000.00) Dollars, which is to be paid without interest. In the event the Apex Gold Mines, Inc., becomes a producing property so that first party is able to draw therefrom his full salary as now agreed upon between him and said corporation, said payments to second party shall then be increased to the sum of One Hundred and Fifty ($150.00) Dollars per month. In addition thereto, in the event that said Apex Gold Mines, Inc., pays any dividends, one-half of the dividends so paid shall be applied upon the extinguishment of said Thirty-five Thousand ($35,000.00) Dollars.

"When the monthly payments are increased to One Hundred and Fifty ($150.00) Dollars per month, second party agrees to remove from the premises now occupied by the parties hereto as a home.

"First party shall endorse over and give to second party as security 25 shares of Seattle First National Bank stock and 5 shares of Puget Sound Power & Light Company stock. Second party shall not dispose of either of these stocks save in the event that first party becomes delinquent in the monthly payments provided for herein. In the event he does become so delinquent, second party shall have the right to dispose of either or both of these stocks as her necessities require, but the proceeds secured by her from said sale, or sales, shall be applied toward the extinguishment of said Thirty-five Thousand ($35,000.00) Dollars."

The agreement contains certain other provisions not material to the questions here presented.

It appears that sometime after the execution of this agreement Mr. and Mrs. Priestley were divorced.

William J. Priestley was a practical miner, and at some previous time had been connected with the operation of the mining property upon which Apex held a lease. In the winter of 1940, the mine was not being operated, and it was supposed that mining operations upon its property might be resumed to advantage. At this time Mr. Priestley was indebted to Elna G. Priestley in an amount approximating thirty thousand dollars, according to the terms of the agreement between them, hereinabove referred to, and it seems to be agreed that he was then delinquent in payments due to

Mrs. Priestley, under the agreement, in the sum of twenty-five hundred dollars. Mrs. Priestley was demanding that the delinquent payments be made, and Mr. Priestley was endeavoring to find a person able and willing to take over the contract upon terms to be agreed upon. In this connection, he consulted his brother, J. G. Priestley, who in turn spoke to Mr. Aylmore concerning the matter.

Emil Peterson, a man of considerable means, had been a client of a deceased attorney who had been an office associate of Mr. Aylmore, and, after the death of his associate, Aylmore had attended to some legal matters for Mr. Peterson, who had made considerable money as the result of mining operations in the Philippine Islands. At Aylmore's suggestion, Peterson became interested in the project of operating the Apex mine, and finally agreed to advance twenty thousand dollars, as he testified, for the purpose of enabling Apex to resume mining operations, it being understood that Aylmore, J. G. Priestley, and Peterson would be jointly interested in the project, though the nature of the contributions to be made by Aylmore and Priestley does not clearly appear.

These three persons were, of course, primarily concerned with gaining control of the corporation by taking over a majority of its capital stock. Of the 4,450,000 shares owned by William J. and Elna G. Priestley, 950,000 shares stood on the books of the corporation in Mrs. Priestley's name, William J. Priestley owning the balance. In order to obtain stock control, it was necessary that Mrs. Priestley's 950,000 shares be included, and she was demanding that, before she relinquished her stock, or released Mr. Priestley's stock from her claim, her contract with her former husband be put in good standing, and, as she claims, be underwritten by some responsible party.

Emil Peterson was then a man sixty-five years of age, who had gone to the Philippines as a soldier in the United States army during the Spanish-American war, and who, after the war, had settled in the islands, where he was employed as foreman in a candy factory. He is a man of little

education, as he testified, having "got into what they called the fourth reader." He never completed even a grade school course. Due to a fortunate investment in stock in a gold mine in the islands, he became quite wealthy, and, sometime prior to 1940, had returned to the United States and taken up his residence in Seattle. He was never in business for himself, always having worked for others. He was willing to engage in a business venture which appeared likely to result profitably, by investing money therein, but was not willing to undertake the responsibility of any business management. It appears that, in response to a suggestion that he guarantee the William J. Priestley contract with Elna G. Priestley, Peterson absolutely refused to do so, but was willing to advance twenty thousand dollars to reopen the Apex mine, provided that he and his associates could control the majority of the corporate stock.

After these negotiations, Aylmore wrote J. G. Priestley the following letter:

"Carrying out our verbal discussion in connection with taking over the management and control of the Apex Mine. In talking with my client and discussing the matter thoroughly, we have these propositions to make:

"1. The transfer from you to the undersigned, of all of the stockholdings of Mr. W. J. Priestley, amounting to approximately four and one-half million shares.

"This transfer of the stockholdings does not mean actual division thereof, but the control of the stock subject to distribution to the proper parties interested must be in the undersigned.

"In return for this control, I will place at your disposal the necessary cash money, the amount now definitely known as approximately $2,500.00, to clean up the lien of Mrs. W. J. Priestley which she holds against all of the holdings of Mr. W. J. Priestley, leaving the original contract that she has with Mr. W. J. Priestley to be carried out in monthly payments in the future.

"2. The undersigned will retain the services of Mr. W. J. Priestley as superintendent of the mine at an agreed salary.

"3. Sufficient money will be at the disposal of the company for the purpose of operating the mine at full capacity commensurate with the present equipment for the present season.

"4. Additional sums will be kept on deposit for the purpose of defraying unforeseen contingencies, all of which sums should total somewhere in the amount of Twenty-five Thousand Dollars ($25,000.00).

"Dated this 19th day of March, 1940."

Mr. Peterson advanced the money and Aylmore turned over to H. A. Martin, Esquire, the attorney for William J. Priestley, twenty-five hundred dollars, concerning which Mr. Martin wrote Aylmore as follows:

"Receipt is hereby acknowledged from you of the sum of Twenty-five Hundred ($2500.00) Dollars, which sum is to be paid to Elna G. Priestley to apply on the contract of October 29, 1937 between Elna G. Priestley and W. G. Priestley, thereby bringing the monthly payments on that contract up to date and leaving this contract to be carried out by yourself and associates in accordance with the arrangement heretofore entered into. This payment is being made in accordance with your letter of March 19, 1940 addressed to Mr. J. G. Priestley and involves a transfer to yourself of approximately 4,500,000 shares of the Apex Gold Mines stock, being the controlling interest in that corporation, as the consideration for carrying out the contract of October 29, 1937.

"In this connection about 900,000 shares of this stock—I think it is an even 900,000 shares—stands in the name of Elna G. Priestley and she cannot be forced to transfer the same until her contract of October 29, 1937 is paid up in full. I think the number of shares standing in the name of W. G. Priestley is 3,500,000, making a total of 4,400,000 shares. This constitutes the control of the corporation."

It does not appear that Mr. Aylmore answered Martin's letter, but later, on several occasions, Aylmore remitted to Elna G. Priestley different sums to be applied upon her contract with her former husband.

Meanwhile, Aylmore and Peterson signed an agreement reading as follows:

"This Agreement made and entered into this 18th day of March, 1940, by and between Reeves Aylmore, party of the first part, and Emil Peterson, party of the second part, Witnesseth:

"That whereas the party of the first part has secured a transfer to himself as trustee, of all of the capital stock of

the Apex Mining Company standing in the name of W. G. Priestley and that whereas the undersigned, Emil Peterson, has loaned to the Apex Mining Company the sum of Twenty Thousand Dollars ($20,000.00), that Twenty-five Hundred Dollars ($2500.00) of the said sum of Twenty Thousand Dollars is to be paid to release the claim of Elna G. Priestley from the property of the Apex Mining Company, and that the balance of the said Twenty Thousand dollars is to be used when needed, as working capital for the said mine.

"That the undersigned, party of the first part is holding the stock above mentioned as security for the faithful and prompt payment of the note above mentioned, to the party of the second part.

"That, whereas, the $2500.00 mentioned above is to be delivered to Elna G. Priestley on the 22nd day of March, 1940 and that to carry out the said agreement, Three thousand dollars ($3,000.00) has this day been deposited subject to the checking account of the party of the first part, leaving a balance of seventeen thousand dollars ($17,000.00), all of which sum of Twenty Thousand Dollars ($20,000.00) is to be returned to the party of the second part out of the first net smelter returns available after payment of mining costs.

"That whereas, for the purpose of facilitating the handling of this contract without withdrawing the seventeen thousand dollars ($17,000.00) from the savings account, it is hereby agreed that deposit book No. 82470 of the National Bank of Commerce is hereby delivered to the party of the first part subject to withdrawal up to the sum of seventeen thousand dollars ($17,000.00) upon demand; that the party of the second part will sign the necessary withdrawal receipts and transfer said amount to a commercial checking account when necessary and as needed in the operation of the mine.

"This contract is made for the purpose of binding our heirs, executors, administrators and assigns.

"DATED this 18th day of March, 1940."

Meanwhile, Elna G. Priestley's reaction to the proposition was to refuse the twenty-five hundred dollar payment, and sue Apex Gold Mines and her former husband in an attempt to prevent consummation of the plan initiated by Aylmore, J. G. Priestley, and Peterson. Mr. Peterson was

not a party to that action. The action was tried, and resulted in a judgment of dismissal.

W. J. Priestley testified that he had no conversation with appellant or Aylmore until several months after the date of the letter from Aylmore to J. G. Priestley.

Money advanced by Mr. Peterson was used in an attempt to reopen the mine, under direction of William J. Priestley as superintendent, and December 12, 1940, William J. Priestley, as first party, and J. G. Priestley, Emil Peterson, and Reeves Aylmore, as second parties, executed an agreement in writing, whereby William J. Priestley agreed to execute a voting proxy to his brother and Mr. Aylmore, covering all the Apex stock standing in his name, the proxy to remain in effect for five years unless sooner canceled. The agreement also provided that the proxy should

". . . cover the stock standing in the name of Elna G. Priestley on the books of said corporation, in so far as the party of the first part has any legal right to execute or give such proxy."

The agreement also contained the following provision:

"Third: It is further agreed that upon the full satisfaction of the said contract of October 29, 1937 with Elna G. Priestley, then the parties hereto shall be equal owners of the said stock in the Apex Gold Mines, Inc., each owning one-fourth (1/4) thereof."

The parties also agreed that they would not sell any of their stock without unanimous consent of all parties.

The agreement contains the following preliminary recitals:

"That WHEREAS the party of the first part, on or about October 29, 1937, entered into a property settlement with his then wife, Elna G. Priestley, under the terms of which contract the party of the first part was to acquire from her all of her right, title and interest in and to the community property belonging to her and the party of the first part, upon the payment to her by the party of the first part of certain sums of money specified in the said contract, which said community property included stock representing the controlling interest in the Apex Gold Mines, Inc., a corporation,

"And WHEREAS the parties of the second part, on or about March 22, 1940, agreed to purchase said controlling interest, and as part of the consideration of the purchase of the said controlling interest, agreed to assume and carry out the terms and conditions of the said contract of October 29, 1937, and did then advance and pay to Elna G. Priestley certain sums of money on account thereof and have since continued so to do,

"And WHEREAS the parties hereto will become equal owners of the said stock in the Apex Gold Mines, Inc., upon the full payment of the said contract."

There can be no doubt but that Peterson turned over to Aylmore approximately $29,800, to be used for the benefit of Apex, without any very clear understanding of what was being done as to the steps taken to place the mine in operation. Doubtless he thought that he was loaning the money to Apex, and he took the corporation's notes for all sums which he advanced, a total of $29,800, turning the money over to Aylmore to disburse as to him seemed best.

In the summer of 1941, Elna Priestley, not having received the monthly payments of $125 for some time, through her attorney wrote Peterson, demanding from him that he continue these payments. Peterson having failed to comply with this demand, Elna G. Priestley instituted this action against Emil Peterson, J. G. Priestley, and Reeves Aylmore, alleging in her complaint the execution of the 1937 agreement between William J. Priestley and herself; that Mr. Priestley had made certain payments thereon; and that, during the month of March, 1940, the defendants named purchased the William J. and Elna G. Priestley block of shares in Apex from William J. Priestley, and agreed with William J. Priestley that as consideration for the purchase of the shares they would assume and pay to plaintiff all demands due or to become due upon the contract, and that they then paid the plaintiff the sum of twenty-five hundred dollars at that time past due. Plaintiff demanded judgment against defendants for the amount of the contract payments then delinquent.

Peterson filed his answer, denying the material allegations of plaintiff's complaint, and pleading affirmatively

want of consideration for any agreement such as was alleged by plaintiff. Defendants Priestley and Aylmore appeared by the latter, denying the allegations of the complaint.

The action was tried to the court, and resulted in the entry of findings of fact and conclusions of law in plaintiff's favor, followed by a judgment against all the defendants, from which Emil Peterson has appealed. It appears that J. G. Priestley and Reeves Aylmore also served a notice of appeal and filed a cost bond, but this latter appeal has not been further prosecuted.

Error is assigned upon the entry of judgment in respondent's favor against Peterson, first, because there was not sufficient evidence to justify a holding that any contract to assume the obligations of the agreement between Elna G. and William J. Priestley was ever made; and second, if any such contract was made, it was made by persons other than Emil Peterson, who had no express or implied authority to bind him.

The trial court found that the contract between respondent and William J. Priestley had been entered into October 29, 1937, in the expectation that the parties would be divorced at the suit of respondent; that the Apex stock owned by the parties was community property, and that 3,500,000 shares thereof stood in the name of William J. Priestley, and 950,000 shares thereof stood in the name of respondent; that March 19, 1940, Mr. Priestley was delinquent in his payments under the contract in the sum of twenty-five hundred dollars; that March 22, 1940, appellant and the other defendants in the action purchased from William J. Priestley all of the stock owned by Mr. Priestley and respondent, agreeing that as consideration for the transfer they would assume and pay to respondent all payments under the contract referred to, then due or to become due; that thereafter appellant and the other defendants took control of Apex, and elected their own directors and officers for the corporation; and that they made to respondent certain payments which thereafter fell due upon the contract. The

court also found that at the time of the trial there was due to respondent on the contract the sum of $2,125. From the findings, the court concluded that respondent was entitled to judgment against appellant and the defendants, and granted judgment accordingly.

From the record it would seem that, in the first instance, respondent contended that appellant's attorney, Aylmore, had by his agreements and conduct bound appellant as by a direct contract to assume William J. Priestley's liability to respondent. In its memorandum opinion, the trial court stated that, in making the agreement, which the trial court found appellant did make, to assume the contract, appellant acted as principal, and that, in the negotiations leading up to the agreement which the trial court found had been made, the relationship of attorney and client did not exist between appellant and Aylmore. Respondent adopts the trial court's theory, and does not contend that Aylmore, as appellant's attorney, so acted as to make appellant liable to respondent.

Respondent calls attention to the fact that, when the twenty-five hundred dollar payment was tendered to respondent, she refused it, and instituted an action against Apex and William J. Priestley for the purpose of preventing appellant and the other defendants in this action from obtaining stock control. Appellant was not a party to that action, and, while Aylmore testified that he informed appellant that respondent had instituted the action for the purpose of preventing the proposed plan concerning its stock from being carried out, it does not appear that appellant's information was such as to afford respondent any advantage in this action. The files in the action referred to are not in evidence, and the record merely shows that the action was instituted, that appellant knew of it to the extent stated, and the trial of the action resulted in a judgment dismissing the same. Any knowledge on the part of Aylmore as to the issues tried is not here material.

It appears from the record that Aylmore and J. G. Priestley were the moving spirits behind the project; that,

through their efforts, appellant became interested in the plan and advanced money, as above stated.

It is difficult to understand just what the net result of the contract which respondent alleges appellant made would have been. The agreement between respondent and William J. Priestley, as above set forth, described nine parcels of real estate, and a group of mining claims, referring to the descriptions as "all of which properties are of problematical value," and provides that upon full payment of the sum of thirty-five thousand dollars respondent will convey to William J. Priestley all her interest in the property described in the contract and any other property belonging to the parties, whether mentioned or not. There is no evidence as to the values of any of the properties. The record contains no evidence as to what was to become of the property described in the contract, other than the Apex stock. It appears that at first it was contemplated that this stock would belong to appellant, Aylmore, and J. G. Priestley in equal proportions, and that later, when the practical operation of the mine was turned over to William J. Priestley, it was decided that he should have a quarter interest in the stock in order to encourage him to use greater effort in the rehabilitation of the mine.

In other words, it is respondent's contention that appellant, knowing that he would be called upon to advance practically all of the money required to finance the proposition, in addition made himself liable to respondent in the sum of approximately thirty thousand dollars, for which he was to receive one-fourth of the total of the amount of the William J.-Elna G. Priestley stockholdings. Whether or not he was to have any interest in the other properties mentioned in the contract between Mr. and Mrs. Priestley, does not appear. All that the record shows concerning these properties is that Mr. and Mrs. Priestley, for their own purposes, placed upon their joint holdings a value of seventy thousand dollars. Appellant advanced to the corporation $29,800, for which he holds the corporation's notes, and in addition respondent seeks to make him liable for the

further sum of approximately thirty thousand dollars. Certainly, the fact that appellant entered into such a fantastic financial arrangement should clearly appear from the evidence before it should be held as matter of law that he assumed such an obligation.

In his letter of March 19, 1940, to J. G. Priestley, Aylmore stated certain propositions, including the delivery to the addressee of twenty-five hundred dollars, to be turned over to respondent, "leaving the original contract that she has with Mr. W. J. Priestley to be carried out in monthly payments in the future." The source of the money with which these payments were to be made is not stated. Doubtless Aylmore's "client," referred to in this letter, was appellant, but respondent is not relying upon any agreement made on appellant's behalf by Aylmore, as appellant's attorney, but upon the court's finding that appellant himself agreed to underwrite the contract, or has by his conduct made himself liable to respondent to the extent found by the trial court.

Respondent also calls attention to the letter which Mr. Martin, as attorney for William J. Priestley, under date March 22, 1940, wrote Mr. Aylmore, *supra*, in which Mr. Martin referred to the W. J.-Elna Priestley contract as "to be carried out by yourself and associates in accordance with the arrangement heretofore entered into." The letter also refers to the twenty-five hundred dollar payment as made in accordance with Aylmore's letter of March 19th to J. G. Priestley.

It does not appear that appellant ever saw this letter, and the writer's assumption as quoted is not binding upon appellant.

The agreement between Aylmore and appellant, dated March 18, 1940, binds appellant no further than to show his assent to the delivery to respondent of twenty-five hundred dollars of the twenty thousand dollars which the agreement recites appellant had then loaned to Apex.

Respondent strongly relies upon the recital in the four-party agreement between William J. Priestley, first

party, and J. G. Priestley, Aylmore, and appellant, second parties, *supra*, in which it is recited that second parties had "agreed to assume and carry out the terms and conditions of the said contract of October 29, 1937," between William J. Priestley and respondent. Respondent was not a party to this agreement, and it is the general rule that "a recital is not binding in an action not founded on the contract." Neither does an estoppel "arise from a recital unless it is of the essence of the agreement." 31 C. J. S., title "Estoppel," p. 235, § 58.

In the early case of *Bingham v. Walla Walla,* 3 Wash. Terr. 68, 13 Pac. 408, the court quoted from Bigelow on Estoppel (3d ed.), p. 289, as follows:

" 'Recitals are generally made for the purpose of indicating or of carrying into effect the general object of the deed, and not for collateral purposes; and hence the rule is, that a recital is conclusive of the facts stated only in an action of which the deed itself is the foundation or defense.' "

In the case of *State ex rel. Wirt v. Superior Court,* 10 Wn. (2d) 362, 116 P. (2d) 752, we said:

"The rule that recitals in a deed bind parties and privies, but not strangers, needs no citation of sustaining authority."

The cases of *In re Springer's Estate,* 97 Wash. 546, 166 Pac. 1134; *Hadley v. Bordo,* 62 Vt. 285, 19 Atl. 476; *Eppenbach v. Eppenbach,* 217 App. Div. 26, 215 N. Y. Supp. 785; and *Houlihan v. Fogarty,* 162 Mich. 492, 127 N. W. 793, are to the same effect.

In his opening brief, appellant argues at length, with copious citation of authority, that the record fails to disclose that Aylmore, as Peterson's attorney, had authority to bind appellant, assuming for the purposes of argument that Aylmore did, in dealing with J. G. and William J. Priestley, undertake to bind appellant to assume the contract in question. It is not contended that either appellant or Aylmore ever had any dealings with respondent until long after the situation had become crystallized.

In her brief, respondent states that she has no quarrel with the major portion of the law cited by appellant, but

contends that the law is not applicable to the facts of the case.

Respondent strongly relies upon the case of *Great Western Theatre Equipment v. M. & E. Theatres*, 164 Wash. 557, 3 P. (2d) 1003, 7 P. (2d) 1119, in which it was held that the defendant had impliedly assumed the obligations of a certain contract for the purchase of equipment in place in a theatre which the defendant had purchased from a third party. In holding that the defendant had assumed the obligations of the conditional sales contract covering the equipment, this court quoted from the opinion of the supreme court of the United States, in the case of *Wiggins Ferry Co. v. Ohio & M. R. Co.*, 142 U. S. 396, 35 L. Ed. 1055, 12 S. Ct. 188, as follows:

" 'It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties, which are only consistent with the adoption of such contract. If a person conduct himself in such manner as to lead the other party to believe that he has made a contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations. 2 Pom. Eq. Juris., sec. 965; *Chicago & A. R. Co. v. Chicago V. & W. Coal Co.*, 79 Ill. 121.' "

The court also quoted from Addison on Contracts (8th ed.), vol. 1, p. 54, to the effect that the intention of the parties to a transaction may be gathered from their acts and deeds, in the light of the surrounding circumstances, as well as from their words.

In this connection, respondent cites several cases in which a third-party beneficiary to a contract has been allowed to recover thereon, including the case of *Washington Perfection Co. v. Davin*, 138 Wash. 427, 244 Pac. 697, which is typical of the cases relied upon by respondent in this connection. In the case cited, it was held that the promise of the president of a corporation, one Davin, embodied in a written agreement with a stockholder, wherein Davin, in consideration of the transfer of all of the corporate stock

to himself, in effect agreed with the stockholder that he would assume and agree to pay all the debts of the corporation, bound Davin to pay the debt due from the corporation to the plaintiff in the action. The contract contained a provision to the effect that Davin "agreed to personally pay each and every of said indebtedness of said corporation." The contract was entered into by Davin for a valuable consideration, was clear and specific in its terms, and a bona fide creditor of the corporation was properly allowed to maintain an action on the contract as one made for his benefit.

In the case of *Grand Lodge etc. v. United States F. & G. Co.*, 2 Wn. (2d) 561, 98 P. (2d) 971, we said:

"The question whether a contract is made for the benefit of a third person is one of construction. The intention of the parties in this respect is determined by the terms of the contract as a whole construed in the light of the circumstances under which it was made."

In the case at bar, there is no evidence concerning any specific agreement on the part of appellant to assume and pay future installments due from William J. Priestley to respondent upon the contract in suit. Appellant lent money to the corporation, for which he took the corporation's notes. He authorized Aylmore to expend the money which he advanced, as the best interests of the corporation should require. He also authorized Aylmore to apply a specified portion of the money which he first advanced to Apex to the clearing of the lien which respondent then claimed to have upon the Priestley stock. Appellant continued to advance funds for the benefit of the corporation, by turning money over to Aylmore to be used as the latter should see fit. The evidence shows that, when it was first suggested to appellant that they should assume, or join with others in assuming, the contract, he utterly repudiated the idea.

It is true, as argued by respondent, that the court may scrutinize the acts of the parties, and is not required to depend only on oral or written statements in determining whether or not a contract has been assumed. If the con-

duct of a party, under the circumstances in which he was acting, be inconsistent with any other interpretation, it may be held that he has assumed an obligation, although he never, by word or writing, agreed to assume it. In the case at bar, however, it cannot be said that appellant's conduct in advancing money to the corporation is consistent only with an intent on his part to assume William J. Priestley's agreement with respondent. It is, of course, true that respondent was incidentally benefited by the arrangement between her brother-in-law, J. G. Priestley, Aylmore, and appellant, but this incidental benefit is not a determining factor in the case.

In the case of *Hortsmann Co. v. Waterman,* 103 Wash. 18, 173 Pac. 733, 1 A. L. R. 856, a judgment of the superior court, holding a guarantor of a contract to pay all the debts of a corporation, was reversed. The court called attention to the fact that our own decisions are not entirely harmonious upon the question of the right of one to recover upon a contract to which he is not a party, calling attention, however, to

"the disposition of the courts not to extend the doctrine here contended for by counsel for respondent to new and doubtful cases, and also to resolve doubts as to the intent of the parties executing a contract, against third parties claiming under it."

In the course of the decision, the court quoted at length from the opinion of the supreme court of Oregon, in the case of *Washburn v. Interstate Inv. Co.,* 26 Ore. 436, 36 Pac. 533, 38 Pac. 620, a portion of the opinion quoted including the following:

" 'But where there is . . . only an executory contract by one person to advance his own money to pay the debts of another, who is a party to neither the contract nor consideration, it is difficult to see upon what principle the doctrine [of third-party beneficiary] can be applied. In such case the contract is not made for the direct benefit of the creditor, but of the promisee, to enable him to obtain money with which to discharge his liability, and, if enforcible at all, it is enforcible by him. The creditors are, of

course, indirectly interested in its performance, for, if the contract is complied with, their claims will be paid, and this may be said of any executory contract whereby a debtor expects to receive money with which to pay his debts; but it has never been held, to our knowledge, that such an interest is sufficient to entitle a stranger to maintain an action to enforce the stipulations of the contract.' "

In the case of *Pacific Mercantile Agency v. First Nat. Bank,* 187 Wash. 149, 60 P. (2d) 6, we said:

"Before a third party can recover upon a contract made for his benefit and to which he is not a party, it must appear to have been the intention of the parties to secure to him personally the benefit of the provisions of the contract.

"Contracts which only create a general obligation to pay the costs of performing a particular undertaking do not show an intention to make such contract for the benefit of a third person who may have furnished materials necessary to the performance thereof."

The cases of *Spokane Merchants' Ass'n v. Pacific Surety Co.,* 86 Wash. 489, 150 Pac. 1054; *Rust v. United States F. & G. Co.,* 87 Wash. 93, 151 Pac. 248; *Forsyth v. New York Indemnity Co.,* 159 Wash. 318, 293 Pac. 284; *United States F. & G. Co. v. Western Seafood Co.,* 190 Wash. 200, 67 P. (2d) 892, are also of interest in this connection.

Examination of the record discloses no evidence that appellant ever intended to assume liability for the unpaid portion of respondent's contract. The fact that payments on account of the contract were made out of funds which appellant advanced in an attempt to rehabilitate the mine is insufficient in law to show an intent on the part of appellant to assume the agreement. Neither did appellant's acts warrant a holding that as matter of law appellant assumed the contract.

The record does not support the judgment against appellant under the third-party beneficiary doctrine.

Respondent argues that appellent and his associates were joint adventurers, and that appellant, as one of the group, is liable to respondent under the law applying to such agreements.

Concerning the joint adventure doctrine, the following text is of interest:

"If money which a person loans to another to be used in a business enterprise is to be repaid by the borrower, whether the venture proves a success or a failure, the contract is ordinarily construed to be one of lending and borrowing and not of joint adventure, and the lender acquires no equitable interest in the property in which the money is invested, nor liability to a third person for debts contracted by the borrower, even though under the agreement he is to share in the profits of the enterprise." 33 C. J. 842, § 4.

In the case of *Griffiths v. Von Herberg,* 99 Wash. 235, 169 Pac. 587, this court said:

"The mere fact of a share in profits of itself constitutes neither a partnership nor a joint adventure. There must be other facts showing that relationship to have been the intent of the parties."

In the case of *Lampe v. Tyrell,* 200 Wash. 589, 94 P. (2d) 193, we said:

"The relationship of joint adventurer is a serious matter, and it should not be held that the parties thereto have assumed the liabilities attached to such an undertaking, without some definite indication of their intention so to do."

In connection with the proceedings which resulted in this lawsuit, it must be remembered that the entire matter was initiated by William Priestley in an attempt to rehabilitate the mine and pay respondent the amount which he had agreed to pay her. He first discussed the matter with his brother, J. G. Priestley, who took it up with Aylmore. When the latter first submitted the proposition to appellant, it was suggested that the latter assume the obligations of William Priestley's contract to pay respondent, which appellant positively refused to do. He did, however, become interested in the matter of advancing money to the corporation, with the object of placing the mine in operation. Appellant never occupied any position other than that of one who loaned funds to the corporation for the purpose

of enabling the corporation to operate the mine upon which it owned a lease.

It is the law that, in the absence of other acts, one who lends money which is to be repaid in any event does not become a joint adventurer with others interested, even though in addition to receiving his loan with interest he expects also to receive a share of the profits of the enterprise. 33 C. J., "Joint Adventures," p. 842, § 4.

In 30 Am. Jur., "Joint Adventures," p. 682, § 11, appears the following:

"A joint proprietary interest and a right of mutual control over the subject matter of the enterprise or over the property engaged therein is essential to a joint adventure."

It does not appear that appellant at any time had or attempted to exercise any control whatever over the mining operation, it being understood that J. G. Priestley and Aylmore had exclusive control of that phase of the operation. Appellant did not have the slightest control even over the disbursement of the funds which he advanced to the corporation. He simply turned the money over to Aylmore, to be disbursed as Aylmore and J. G. Priestley deemed advisable.

In the case of *Carboneau v. Peterson,* 1 Wn. (2d) 347, 95 P. (2d) 1043, is found the following (p. 376):

"The relationship must possess the element of equal right to a voice in the manner of performance of the enterprise. By this is meant that each of the parties has an equal right in the management and conduct of the undertaking, and that each may equally govern upon the subject of how, when, and where the agreement shall be performed. If the will or pleasure of one party is to control the others in these respects, there is no joint adventure."

By the agreement between Aylmore and appellant referred to above, pursuant to which appellant advanced his first loan to the corporation, it was agreed that of the money advanced by appellant, twenty-five hundred dollars should be used "to release the claim of Elna G. Priestley *from the property of the Apex Mining Company,* and that the balance of" the money was to be used when needed as work-

ing capital for the corporation. This contract further recited that Aylmore was holding the corporate stock as security for the faithful and prompt payment to appellant of the money which he had advanced.

At the time respondent contends that she relied upon Aylmore's agreement to pay her contract, the foregoing was the sole commitment that appellant had made. The document defines the relations between appellant and Aylmore as that of lender and security holder. At this time nothing had occurred from which the relationship of joint adventurers could be implied.

In the case of *National Surety Co. v. Winslow,* 143 Minn. 66, 173 N. W. 181, is found the following:

"In short, the only interest interveners have in the contracts or the performance thereof is the stipulated share of the net profits. But that does not create a copartnership or a joint adventure. [Citing cases.] They are entitled to a return of the money loaned or advanced, and stand to lose only in the event there shall be no net profits. The money advanced is not contributed to the enterprise, and must be repaid whether the venture is a success or a failure."

In the case of *Dubos v. Jones,* 34 Fla. 539, 16 So. 392, the court, considering a case of alleged partnership, held that no liability existed on the part of one sought to be held as a partner, although the facts from which a partnership (or a joint adventure) might have been found to exist were apparently stronger than those in the case at bar. The opinion is well reasoned, and should be read in connection with the question now under discussion.

The term joint adventure is rather new to the law, but the principles which control agreements of joint adventure have often been discussed in cases involving alleged partnerships.

The following authorities also support our conclusion that appellant was not a joint adventurer with Aylmore and J. G. Priestley: *Curry v. Fowler,* 87 N. Y. 33, 41 Am. Rep. 343; *Meehan v. Valentine,* 145 U. S. 611, 12 S. Ct. 972; *Clark v. Barnes,* 72 Iowa 563, 34 N. W. 419; *Thillman v.*

*Benton,* 82 Md. 64, 33 Atl. 485; *Richardson v. Hughitt,* 76 N. Y. 55, 32 Am. Rep. 267; *Keogh v. Minrath,* 8 N. Y. Supp. 816; *Kurth v. Maier,* (N. J.) 31 A. (2d) 835.

Unless it be held that appellant, Aylmore, and J. G. Priestley actually became joint adventurers, respondent cannot hold appellant in this action as a joint adventurer, as appellant never at any time held himself out to respondent as occupying that relation, or made any representation to respondent which could operate against him as an estoppel to deny the existence of a joint adventure. It must be borne in mind that appellant advanced money to the corporation for the sole purpose of enabling the corporation to operate the mine, and that respondent relies on what happened in March, 1940, as making appellant liable to her in this action.

In the case at bar, the corporation executed its notes, payable to appellant, for all of the money which appellant advanced. Appellant, of course, ran the risk of the insolvency of the corporation, which risk inheres in any loan.

It is the general rule that, when parties become joint adventurers, the act of one will bind all, in so far as such act is within the general scope of the enterprise. Here, however, Aylmore's authority to bind appellant was limited. Aylmore testified:

"As I said, Mr. Peterson wasn't interested in it at all if he was going to assume a $30,000 obligation in addition to putting in $20,000, and for a time it looked like there was a deadlock between Mr. Peterson and Mr. J. G. Priestley and myself."

Testifying further:

"Q. How was the other $125.00 a month to be paid? A. We were going to continue to pay $125.00 for a short period of time out of that fund Mr. Peterson had there, and we didn't even expect to have to tell Mr. Peterson we were going to do it, and then the money was to come out of the property, coming from all four of us, including William J. Priestley. . . . Q. And you discussed the manner in which it was going to be paid? A. Yes, sir. And in those

conversations it was definitely stated to Jim Priestley that this deal could not possibly have been made if Mr. Peterson was to assume $30,000. . . . Q. And you were authorized to make a deal for the purchase of the stock? A. Yes, sir. Q. They told you to go ahead? A. Yes, sir. And I didn't want to assume the $30,000 liability. Q. You didn't assume the $35,000 liability either? A. No, sir; not on my own or his part."

Concerning promises made to her, respondent testified:

"Q. And did you receive any assurance from anybody about whether or not your payments would be made? . . . A. Yes, sir; I was assured the payments were to commence April 1, 1940. Q. Was anything said to you about where the money would come from, out of the property? A. No one ever said it would come out of the property. They assured me my monthly payments would be made promptly. Q. When the payments became delinquent did you see Mr. Aylmore about it? A. Yes, sir. Q. What did he say? A. He said he would give me a check for August 1st payment if he could, but he began the 1st of September, and he said he couldn't keep up the payments at the time in one lump sum, but he would try to clear it up in installments, but after that I never could get them. Q. William Priestley was delinquent in his contract with you? A. Yes, sir. Q. At the time this deal came up? A. Yes, sir. Q. And it was agreed he was delinquent about $2,500? A. Yes, sir; that was the agreement."

And on cross-examination:

"Q. You say you were assured you would receive these payments. Who assured you? A. Mr. Martin, right after the trial here, said there was a couple waiting for me in the sum of $250.00 for the 1st of April and May, and William Priestley told me. Q. Your former husband? A. Yes, sir. He understood I was to be paid. Q. Who else told you? A. Mr. Aylmore assured me later he would keep up those payments when I spoke to him about it. That was about August. Q. Who else? A. Mr. Aylmore."

From respondent's testimony, she might contend that Aylmore assumed some liability towards her, but his statements to her did not purport to bind anyone but himself.

In 33 C. J., p. 871, § 99, appears the following text:

844

"As to third persons who deal with a joint adventurer in good faith and without knowledge of any limitation upon his authority, the law presumes him to have been given power to bind his associates by such contracts as are reasonably necessary to carry on the business in which the joint adventurers are engaged, and they become liable upon such contracts, notwithstanding they may have expressly agreed amongst themselves that they should not be liable. But he cannot bind his associates by contracts made outside of the scope of the business in which they are engaged, or by contracts made for his individual benefit.

"*Liability of undisclosed member.* One who is a member of a joint adventure but who is unknown to be such at the time by a third person who enters into a contract with another member individually is not rendered liable to such third person for services rendered under such contract, or for damages for the breach thereof, by the fact that the contract relates to the business of the joint adventure if the contracting member in making such contract exceeded his authority and had no power to bind his associates thereby."

At the time of the conversations with Aylmore concerning which respondent testified, she was not acquainted with appellant. She did not testify that at that time she had ever heard of him.

There is no element of estoppel in the case, as respondent did not rely, to her detriment, upon any statement or act of appellant, nor has she changed her position in reliance thereon.

All of the money advanced by appellant having been loaned to the corporation, he having received and accepted the corporation's notes therefor, by which the corporation obligated itself to repay the money in any event, and the record containing no evidence which renders appellant liable as a joint adventurer to respondent upon any other theory, we hold that respondent's contention that the judgment appealed from should be affirmed upon the ground that appellant is liable to her as a joint adventurer with Aylmore and J. G. Priestley is not well founded.

The trial court's findings in respondent's favor are against

the decided weight of the evidence. The judgment appealed from is accordingly reversed, with directions to dismiss the action.

ALL CONCUR.

March 6, 1944. Petition for rehearing denied.

[1]Reported in 145 P. (2d) 273.