COAST TRADING COMPANY, INC., *Respondent*, v. PARMAC, INC., *Appellant*.

*Riddell, Williams, Ivie, Bullitt & Walkinshaw* and *Stimson Bullitt,* for appellant.

*William V. Vetter,* for respondent.

REED, J.—The defendant Parmac, Inc. (Parmac) appeals from a money judgment in favor of plaintiff Coast Trading Company, Inc. We affirm the judgment as modified in amount.

Plaintiff Coast Trading Company (Coast) engages in buying and selling grain and other like commodities. The company maintains its head office in Portland, Oregon, but has storage facilities in several western states. In 1972 Coast contemplated establishing such a facility in Lewiston, Idaho. Although its plans were tentative—it had not acquired the necessary site—Coast orally contracted with Freeman Butler, an engineer of sorts with offices in Seattle, to do preliminary design work on the Lewiston facility. Butler was performing similar work for Coast at its plants in Missoula and Spokane, pursuant to an oral agreement that he receive an hourly rate for his services and a 5 percent commission on any equipment he might purchase for Coast. Butler had an arrangement with a number of companies which entitled him to a dealer discount.

Pursuant to this agreement, Butler prepared preliminary plans for the Lewiston plant; these plans called for using steel bolted storage tanks. Even though Coast's plans remained uncertain, Butler took it upon himself to solicit quotations for the construction of such tanks from Parmac, a heavy equipment manufacturer with principal offices in Tulsa, Oklahoma. On May 21, 1973, Parmac sent to Butler in Spokane a "quotation" of $280,353, excluding freight, for fabrication of the tanks. The quoted price patently reflected a 10 percent discount from the company's list prices. The May 21 quotation was never shown to Coast; instead Butler requested and received from Parmac a second quotation on May 28, which concealed the 10 percent discount and quoted a price of $311,503, excluding freight. At the same time, and unknown to Coast, Parmac agreed to pay Butler 10 percent of the total contract price upon final payment.

By July 1973, Coast still had not acquired the Idaho site, and had adopted no definite construction schedule. Nevertheless, on July 27 Butler convinced Coast it should submit an immediate order for the tanks to "freeze" the price as a hedge against anticipated increases in the price of steel. Coast reluctantly agreed after receiving Butler's assurances that the order could somehow be adjusted depending upon Coast's final decision regarding the Lewiston facility. As a prelude to these discussions, Butler had provided Coast with copies of the May 28 quotation; the trial court found he did not, however, furnish those pages which contained Parmac's "Standard Terms and Conditions of Sale" which included the following cancellation clause:

> Orders for specially constructed equipment cannot be canceled or changed under any circumstances *without Seller's consent.* In the event of cancellation or change by the Purchaser of an order for specially constructed equipment *with the Seller's consent,* the Purchaser agrees to reimburse the Seller for actual costs incurred including but not limited to re-stocking, engineering and manufacturing costs. A minimum 15 ͑ cancellation and re-stocking charge shall be made on all orders of goods which are canceled.

(Italics ours.) Parmac's quotation form was drafted so that the signature of the purchaser would convert the form to a purchase order, subject to Parmac's acceptance; however, on July 28 Butler submitted a purchase order using his own form. The order did not specifically refer to Parmac's quotation; it did, however, coincide with the quotation in subject matter, price and freight charges. From the outset Parmac knew Butler was purchasing for Coast and the purchase order directed shipment of the completed tanks to Coast at Lewiston. On July 31, 1973, Butler sent to Coast an "invoice" requesting that a check for $77,875 be mailed directly to Parmac; this represented the 25 percent down payment specified in Parmac's quotation; Coast complied on August 2. Upon receipt of Butler's purchase order and Coast's check, Parmac sent to Butler an "acknowledgment"

and instructed its tank division to commence production. The acknowledgment form provided *inter alia:*

> We acknowledge and accept subject purchase order provided that you accept and assent to Parmac's Standard Terms and Conditions of Sale appearing on the reverse side thereof, which are different from and/or in addition to the terms and conditions stated in your purchase order. Unless otherwise agreed to in writing, Parmac's Standard Terms and Conditions of Sale shall govern.

As the time approached for Parmac to begin shipping a portion of the order, Butler discussed the matter with Coast's president, William H. MacDonald. According to Butler, MacDonald, despite his concern the company had still not acquired the Lewiston site and was otherwise unprepared to accept delivery, instructed Butler to place a "hold" on further production; Butler did so by telephone on October 15.[1] Parmac assented to the "hold," but on November 1 wrote to Butler pointing out it could no longer delay production and asking that the hold be lifted. Other letters followed in which Parmac advised that any increased costs caused by the "hold" would have to be passed on to "the customer." Finally, on November 26 Parmac wrote Butler insisting that the hold order be lifted by December 4 or the contract would be canceled and calling Butler's attention to the 15 percent cancellation fee.

In the interim, Coast became disenchanted with Butler and on November 28 MacDonald traveled to Missoula and "terminated" Butler. Butler immediately informed Parmac the contract would have to be canceled. After Butler vacated his Missoula office, his successor discovered

---

[1] In his deposition and at trial MacDonald denied he requested Butler to obtain a delay in production, professing ignorance of Parmac's delivery schedule for the tanks. However, in his pretrial affidavit he admitted that Butler had asked for a delay because Coast's plans were still uncertain. Also, the copies of the May 28 quotation which Butler furnished to Coast in July called for shipment to commence in 12 to 13 weeks. One copy of the quotation was attached to Butler's note asking Coast's treasurer to send a check for the down payment directly to Parmac. On this copy—produced from Coast's files at trial—the delivery schedule had been boldly marked for emphasis.

Parmac's November 26 letter. Realizing that its down payment was in jeopardy, Coast took immediate steps to contact Butler and Parmac to clarify the situation and salvage what it could. These negotiations were made difficult because Parmac insisted upon dealing through Butler, contending its contract was with him, and not with Coast. Ultimately, negotiations involving all three parties broke down and Coast demanded return of its down payment. Parmac, however, insisted the contract had been canceled and that it was entitled to retain a cancellation fee of $46,725.45. Pursuant to Butler's request, and ignoring Coast's demands, Parmac forwarded the balance of $31,149.55 to Butler. Coast then brought this action against Parmac and Butler to recover the total down payment. After a trial to the court, findings of fact and conclusions of law were entered, the tenor of which was: (1) there was no contract between Coast and Parmac—the only contract was between Butler and Parmac; (2) the contract was "canceled," causing damages to Parmac of $13,230; (3) Parmac was a "stakeholder" of funds provided by Coast and was liable to Coast for the balance of the down payment over and above its damages. Accordingly, Coast was granted judgment against Parmac for $33,495.45 ($46,725.45 less Parmac's "damages" of $13,230) and against Parmac and Butler's estate for $31,149.55.[2] Parmac was given judgment over against Butler for the $31,149.55. Parmac appealed and its assignments of error basically challenge the findings and conclusions hereinabove set forth.

## PARTIES' THEORIES

Coast elected to sue for recovery on a theory of "money had and received," contending that Parmac had known at all times that Coast was the "actual party in interest," having furnished the funds for the down payment. Parmac's defense was that it had contracted only with Butler; that

---

[2]Butler died after his deposition was taken, but before trial; his estate was duly substituted as the defendant. The administrator of Butler's estate has not appealed.

because Butler had canceled the contract Parmac had no need to account to Coast for any portion of the down payment. Although Coast took the position at trial that Butler was its agent and had negotiated a contract between Coast and Parmac, this theory appears to have been abandoned somewhere along the line and is not argued on appeal. Rather, both parties have elected to denominate Coast a "third-party beneficiary" of the contract between Butler and Parmac. This mutual adoption of what we believe is an incorrect theory led the trial court to apply incorrect legal principles to the relationship of the parties. However, because the material facts are not disputed—many of the findings of fact are conclusions of law—we have been able to resolve the issues as a matter of law. By doing so we affirm the trial judge's conclusion on liability, albeit on a different theory, *Vikingstad v. Baggott,* 46 Wn.2d 494, 282 P.2d 824 (1955), but modify his award of damages.

### MONEY HAD AND RECEIVED

■ The count for "money had and received" is an ancient common-law remedy with equitable overtones; it is based upon quasi contract or contract implied in law. *King County v. Odman,* 8 Wn.2d 32, 111 P.2d 228, 133 A.L.R. 1440 (1941). Under such a count the right of recovery arises independently of the express agreement or intent of the parties, where the facts are such that the holder of another's funds would be "unjustly enriched" if the law did not presume a promise to pay. *See generally* 66 Am. Jur. 2d, *Restitution and Implied Contracts* §§ 156–57 (1973); Restatement of Restitution, Introductory Note to Part I and § 1 (1937). Even though the action is looked upon with favor by the courts and is liberally applied, *Cone v. Ariss,* 13 Wn.2d 650, 126 P.2d 591 (1942), it does not lie in every instance where one party claims money from another. The doctrine applies only if plaintiff's claim is based upon some recognized equitable principle such as mistake, coercion,

duress, fraud, illegality of contract, impossibility of performance or failure to perform a fiduciary duty. As stated in *Moore v. Mandlebaum,* 8 Mich. 433, 447 (1860):

> [A]s a general rule, where money has been received by a defendant under any state of facts which would in a court of equity entitle the plaintiff to a decree for the money, when that is the specific relief sought, the same state of facts will entitle him to recover the money in this action.

■ We perceive no equitable basis for Coast's claim that Parmac holds a specific fund which it acquired in a manner which would render its retention unconscionable. Coast voluntarily forwarded the money to Parmac and Parmac had a perfect right to receive it. Having the money in hand, Parmac began its performance of the promise given in exchange therefor. If Parmac owes money to Coast, the obligation arises out of the contract; it is a mere debt and is subject to all the usual contract defenses. *Moss v. Condict,* 16 So. 2d 921 (Fla. 1944). The argument that Coast is a third-party beneficiary with a direct right of action on the contract is clearly inconsistent with a claim for money had and received. Finally, on this issue, the count for money had and received may not be used to recover the monies which Parmac paid over to Butler prior to commencement of this action. As the name implies, the remedy is for the recovery of money actually received and wrongfully withheld from plaintiff. Here, Parmac no longer holds the $31,149.55. *See generally* 66 Am. Jur. 2d, *supra* at § 158.

### COAST WAS NOT A THIRD-PARTY BENEFICIARY

■ As we have noted, the trial court appears to have accepted the third-party beneficiary espoused by both parties, although he refers to Parmac as a "stakeholder." We think the trial judge's reliance upon the case of *Gray v. England,* 69 Wn.2d 52, 417 P.2d 357 (1966), is misplaced and we cannot agree with his conclusion as a matter of law. As stated in *Lonsdale v. Chesterfield,* 19 Wn. App. 27, 31, 573 P.2d 822 (1978):

A third party beneficiary is one who, though not a party to a contract, will nevertheless receive direct benefits therefrom. The right of a third party beneficiary to sue upon a contract depends, as a rule, upon whether the contract is for his direct benefit or whether his benefit under it is merely incidental, indirect or consequential.

(Citations omitted.)

In *Grand Lodge of Scandinavian Fraternity of America, Dist. 7 v. United States Fidelity & Guar. Co.*, 2 Wn.2d 561, 569, 98 P.2d 971 (1940), the court states:

The question whether a contract is made for the benefit of a third person is one of construction. The intention of the parties in this respect is determined by the terms of the contract as a whole construed in the light of the circumstances under which it was made.

*See also Priestley v. Peterson*, 19 Wn.2d 820, 145 P.2d 253 (1944). In *American Pipe & Constr. Co. v. Harbor Constr. Co.*, 51 Wn.2d 258, 266, 317 P.2d 521 (1957), the court recognized that:

[S]uch "intent" is not a desire or purpose to confer a benefit upon a third person, nor a desire to advance his interests, but an intent that the promisor shall assume a direct obligation to him.

*See also Vikingstad v. Baggott, supra;* 17 Am. Jur. 2d *Contracts* § 305 (1964); 81 A.L.R. 1271, 1287 (1932). Further, as stated in 1 Restatement of Contracts § 133 (1932):

(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is, . . .:

. . .

(b) a creditor beneficiary if . . . performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, . . .

(c) an incidental beneficiary if neither [a donee or creditor beneficiary] exist.

Thus, if the only contract was between Butler and Parmac, Coast would be at most an incidental or consequential beneficiary. If in fact Parmac intended to contract only with Butler, there is no evidence from which it can be inferred that Parmac intended thereby to confer a *direct benefit*

upon Coast, *i.e.*, assume a direct obligation which Butler owed to Coast. In fact, this would have been impossible because, at the time of contracting, Butler owed Coast no duty to construct steel tanks for the Lewiston site. Parmac was therefore assuming no obligation of Butler when it agreed to construct the tanks even though it knew they were to be owned by Coast. *McDonald Constr. Co. v. Murray,* 5 Wn. App. 68, 485 P.2d 626 (1971); *cf. American Pipe & Constr. Co. v. Harbor Constr. Co., supra; see also* Illustration 1 of 1 Restatement of Contracts § 147, *supra.*

### CONTRACT WAS BETWEEN COAST AND PARMAC— BUTLER WAS COAST'S AGENT

▆ As we have demonstrated, Coast had no cause of action against Parmac either for money had and received or as a third–party beneficiary. Coast's right of recovery can be sustained, however, on the theory that Butler was in fact the agent of Coast and his actions resulted in a contract between Coast and Parmac. The question of agency is one of mixed law and fact. As stated in *Robbins v. Wilson Creek State Bank,* 5 Wn.2d 584, 105 P.2d 1107 (1940) at page 595:

> "Whether an agency has in fact been created is to be determined by the relations of the parties as they exist under their agreements or acts. If relations exist which will constitute an agency, it will be an agency whether the parties understood the exact nature of the relation or not." 2 Am. Jur. 26, § 24.

Based upon the undisputed facts of this case, it is clear as a matter of law that Butler was not acting on his own behalf, but as the agent of his disclosed principal, Coast. MacDonald, who gave Butler actual authority to submit an order for the tanks, refers repeatedly in his testimony to "our order." His testimony makes it clear he realized that Coast would become legally obligated *to some extent* if Butler placed the order on its behalf. After all, he had Parmac's quotation in hand. It was because MacDonald recognized this fact that he reluctantly succumbed to Butler's blandishments and,

upon his assurance that we would be able to *alter our shipping schedule* or alter the types of tanks that we needed, we went ahead with the order on his recommendation.

(Italics ours.) To further explain his action, MacDonald stated he believed that it was not uncommon in the business world for orders to be canceled, citing the purchase of airplanes and automobiles as examples.

Whether it be attributed to business naiveté, or simply unjustified reliance upon Butler, the fact remains that Coast endowed Butler with actual authority to subject Coast to a binding agreement with Parmac. This was confirmed when Coast forwarded its check for the down payment to Parmac. Parmac knew the order was placed for Coast; it knew Butler was an engineering consultant, and that he had no personal use for $300,000 worth of grain storage tanks. It is also clear that neither party had any expectation that Butler would personally pay for the tanks or even that he had the financial resources to do so. Finally, it will be remembered that Parmac's first quotation openly deducted a 10 percent dealer discount. When Parmac separately agreed to pay Butler a hidden 10 percent commission, which was contingent on Coast's final payment, it could not have been dealing with him as a principal. Despite the post litem motam protests of Parmac that it did not contract with Coast, we hold that it did and that Coast may maintain a direct action on that contract.

### The Contract Included Parmac's Standard Terms and Conditions

The trial court found that Coast had not been apprised of Parmac's standard terms and conditions of sale which included the cancellation fee. The court also erroneously concluded that Butler's purchase order (the offer) did not incorporate Parmac's standard terms and conditions because (1) it was not submitted on Parmac's form, and (2) it did not specifically refer to the quotations. He also

held that Parmac's "acknowledgment" was not an acceptance because it attempted to vary the terms of Butler's offer by conditioning acceptance on incorporation of the standard terms and conditions. The trial court finally held that a contract was formed when Parmac received the down payment and ordered its tank division to proceed with construction. As a result, the court concluded that the agreement did not include the 15 percent cancellation clause. We cannot agree with the trial judge's conclusions in this respect.

██ Parmac's quotation to Butler was an invitation to submit an offer of purchase on the terms and conditions therein outlined; the purchase order must be read in light of the quotation which inspired its submission; when so viewed, the purchase order necessarily incorporated Parmac's standard terms and conditions. In *A. Belanger & Sons, Inc. v. United States*, 275 F.2d 372 (1st Cir. 1960), the court held that when a buyer orders from a catalog or price list which informs the buyer that certain conditions of sale will apply to the purchase of the items listed, the conditions are necessarily incorporated into the offer and, upon acceptance, become a part of the contract in the absence of further negotiations. *See also United States Indus., Inc. v. Semco Mfg.*, 562 F.2d 1061 (8th Cir. 1977); 1 S. Williston, *Law of Contracts* § 90D (W. Jaeger, 3d ed. 1957); 3 A. Corbin, *Contracts* § 543 (1960). Here, Parmac's quotation forms clearly state that offers to purchase the material described therein are made in accordance with the company's standard terms and conditions. It is inconceivable that Parmac would agree or that Butler presumed the company would agree, to construct $300,000 worth of specially ordered tanks on the bare bones of Butler's order form. The "acknowledgment" was, by its express terms, an acceptance of Butler's purchase order and when the acknowledgment or acceptance was issued a contract was formed. RCW 62A.2-207. The reassertion in the "acknowledgment" that acceptance was conditioned on the buyer's assent to inclusion of the standard terms and conditions of the quotation

was mere surplusage; as such there was no attempt to vary the terms of Butler's offer so as to give rise to a "battle of the forms," nor did the phraseology of the acknowledgment bring into play the provisions of RCW 62A.2–207(2). We conclude that Butler's purchase order, having necessarily incorporated Parmac's standard terms and conditions, was unconditionally accepted by Parmac and the cancellation clause was a part of the contract thus formed. It makes no difference that Butler failed to apprise Coast of all the terms and provisions of the contract which he had effectuated on its behalf. The knowledge of the agent acting within the scope of his authority is imputed to his principal. Restatement (Second) of Agency § 272 (1958).

### FINDING OF CANCELLATION NOT CHALLENGED

The trial court made no specific finding that either Butler or Coast had breached or repudiated the agreement. It did, however, find that the contract had been "canceled" and awarded damages to Parmac as an offset. Coast has not cross–appealed from either that finding or from the damages awarded Parmac. We therefore deem it unnecessary to discuss whether Butler had authority as Coast's agent to agree upon a cancellation of the contract after his "termination." In any event, it appears from the record that Coast never offered to reinstate or perform the contract in strict accordance with its original terms, nor did Coast ever demand that Parmac proceed with construction. Not having been able to reach a solution satisfactory to it, Coast permitted the cancellation to stand.

### VALIDITY OF THE CANCELLATION CLAUSE— MEASURE OF DAMAGES—LOST PROFIT— DEDUCTION OF OVERHEAD

Coast argues that if the cancellation clause is held to be a part of the contract, the provision is invalid because it calls for the imposition of a penalty rather than for liquidated damages. RCW 62A.2–718(1).[3] This issue was not

---

[3]RCW 62A.2–718(1) provides:

addressed by the trial court because it found the clause was not part of the contract. This finding made it necessary for both parties to offer evidence of the actual damages sustained by Parmac. Although we hold the contract included the cancellation clause, we believe a discussion of the measure of damages is necessary in order to fully address the penalty argument. After deducting from the contract price all direct costs of labor and materials which would have been expended in performance, including so-called "burden" or overhead, Parmac showed a loss of profit in excess of $80,000. The trial court, however, accepted Coast's theory that an allocable share of plant "burden". or overhead such as engineering, selling, and general administration expense should be deducted as costs saved when Parmac was relieved of performance. Use of this latter formula resulted in a profit loss of only $7,811.[4] We agree with Parmac that overhead expenses or plant "burden" should not have been deducted in computing Parmac's lost profit.

RCW 62A.2-708(2) provides as follows:

If the measure of damages provided in subsection (1) [contract price—market price differential] is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer,[5] . . .

---

"Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

[4]The trial court assessed Parmac's damages at $13,230, consisting of $5,419 in expended costs and $7,811 loss of profit.

[5]Coast argues that Parmac failed to carry its burden of showing that the damages provided by RCW 62A.2-708(1) were inadequate. Parmac's evidence, however, established that only a portion of the tanks had been partially completed and there was no ready market for them. Also, the special gauge steel which had been set aside and staged for this construction job had to be restaged and

In *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715 (3d Cir. 1971), the court stated at pages 719–20:

[W]here the plaintiff's overhead or fixed expenses are not affected by the defendant's breach, no deduction should be made in calculating the profits which the plaintiff would have made had it not been for the breach. It is obvious that fixed expenses are an essential element in determining the net profits of any business and must, for accounting purposes, be allocated among each of the business' sales activities. Nevertheless, . . . it does not follow that a proportionate share of fixed expenses should be considered a cost factor in the computation of lost profits:

" . . .

Furthermore, it is apparent that the fixed expenses of a business must be paid from the profits remaining after all direct costs have been paid. Unless damages restore the latter amount to plaintiff, it will not be fully compensated for the breach. . . . [E]ven a business which has suffered a net loss before the breach is entitled to damages if the breach deprives it of additional revenue which it could have used to help defray its overhead expenses.

And in *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 798–99 (3d Cir. 1967), this statement is found:

Although there is authority to the contrary, we feel that the better view is that normally, in a claim for lost profits, overhead should be treated as a part of gross profits and recoverable as damages, and should not be considered as part of the seller's costs. . . . [S]ince overhead is fixed and nonperformance of the contract produced no overhead cost savings, no deduction from profits should result.

. . .

Significantly, the Uniform Commercial Code, . . . provides for the recovery of overhead in circumstances similar to those presented here. Under [UCC] § 2–708, the seller's measure of damages for non–acceptance or repudiation is the difference between the contract price and the market price, but if this relief is inadequate to put

attempts made to find a use for it on other orders. Under these circumstances, subdivision (2) provides the proper measure of damages.

the seller in as good position as if the contract had been fully performed, . . . then the measure of damages is the *profit* (*including reasonable overhead*) which the seller would have made from full performance by the buyer . . . [UCC] § 2–708(2). . . . While this contract is not controlled by the Code, the Code is persuasive here because it embodies the foremost modern legal thought concerning commercial transactions.

*See also King Features Syndicate v. Courrier,* 241 Iowa 870, 43 N.W.2d 718 (1950); 5 A. Corbin *Contracts* § 1038 (1964); J. White & R. Summers, *Uniform Commercial Code* §§ 7–13 (1972); Annot., 3 A.L.R.3d *Damages—Overhead Expense* 689 (1965).

 Even though the Coast order was the largest Parmac had ever received and constituted 25–30 percent of the company's 1973 sales, the evidence was not persuasive, nor did the trial court find that loss of the order caused either a major reduction in work force or a plant shutdown. Rather, it appears that company personnel were diverted to other projects within the plant, including "unstaging" the steel set aside for the order, and there was no savings in overhead cost. Consequently Parmac was damaged to the extent the Coast contract would have defrayed these overhead expenses.

The fact that Parmac was able to demonstrate "actual" damages substantially in excess of 15 percent of the contract price, adequately disposes of Coast's contention the cancellation clause provided for a penalty rather than liquidated damages. Parmac, of course, has always maintained that the clause should be upheld as an agreed limitation upon its recovery. RCW 62A.2–719. In any case, because Parmac prepared the contract and was in the best position to estimate the losses it might suffer from a cancellation, it will be restricted to that amount. *Cf. Underwood v. Sterner,* 63 Wn.2d 360, 367, 387 P.2d 366 (1963); *Brower Co. v. Garrison,* 2 Wn. App. 424, 435, 468 P.2d 469 (1970).

If the cancellation clause is strictly enforced, Parmac is entitled to $46,725.45 (15 percent times $311,503). However, to the extent this sum includes 15 percent of Butler's

"hidden commission"—a commission Parmac never had to pay—the result would, in our opinion, be "unconscionable," RCW 62A.2–302. Accordingly, the sum of $4,672.50 will be deducted, leaving a net cancellation fee of $42,052.95.

## PARMAC'S PAYMENT TO BUTLER

■ The contract being between Coast and Parmac, the latter clearly owed Coast the difference between the down payment and the cancellation fee. Instead of honoring Coast's demand for payment, however, Parmac elected "at its own peril" to pay the debt to Butler; Parmac, of course, owed no commission to Butler. Although Butler had actual authority to negotiate a binding contract between Parmac and Coast, the record is absolutely devoid of any evidence that his agency extended to collecting money belonging to Coast. Parmac had no reason to believe he had any such authority. In fact, Parmac knew of the "termination" of Butler's agency before it paid him. Therefore, unless Parmac could show the money found its way from Butler to Coast *as a payment on Parmac's account,* Parmac is not entitled to credit the payment against its account to Coast. This brings us to Parmac's last assignment of error.

## NO CREDITS FOR PARMAC

Parmac contends that, if it is held liable for the payment to Butler, it should be given certain "equitable" credits. This claim is based upon Butler's deposition, in which he testified that he deposited the funds received from Parmac in his business account, paid $11,890.55 on accounts owed by Coast at its Missoula plant, and deposited $11,612.57 in a "joint" savings account with Coast. Parmac argues that Coast received the benefit of these two sums. This contention has no merit. Coast and Butler had a continuing business relationship which involved projects other than the Lewiston facility. The differences between them gave rise to a separate lawsuit wherein Coast sought and apparently obtained an accounting and damages from Butler. By post-trial order the trial judge found that the savings account had been established by agreement between Butler and

Coast to secure payment of any judgment Coast might obtain in the other proceedings. In any event, Parmac's evidence that the money was deposited to the account *in satisfaction of Parmac's debt to Coast* and that Coast had an unencumbered right to draw down the money is clearly insufficient. Any separate identity the funds might have had was lost when Butler commingled them with the funds in his personal business account. Parmac had simply failed to prove that identical dollars were funneled through Butler to Coast to discharge Butler's indebtedness.

Nor do we understand Parmac's position with respect to the debts paid by Butler which were unrelated to this transaction. The essence of Parmac's position is that Coast's down payment constituted a separate identifiable fund in Parmac's possession; that the portion which was wrongfully paid over to Butler retained its identity and was somehow impressed with trust characteristics in Parmac's favor; that Parmac had the right to dictate application of the funds to the payment of particular debts, *i.e.*, the debt owed by it and Butler to Coast. Parmac cites no authority for this novel proposition; we find none and refuse to adopt such a rule.

To summarize, from the $77,875 down payment, Parmac is entitled to retain $42,052.95 as a cancellation fee, and is liable to Coast for the difference of $35,822.05, representing the $31,149.55 wrongfully paid to Butler and the $4,672.50 improperly assessed as a cancellation fee on Butler's non-existent commission.

The judgments are affirmed as modified.

CALLOW and DORE, JJ., concur.

Reconsideration denied February 14, 1979.