**James D. THALER, d/b/a Thaler Engineering Company, Plaintiff,**

v.

**I C I UNITED STATES, INC., Defendant.**

**Civ. A. No. C 77–0081 L(A).**

United States District Court, W. D. Kentucky, Louisville Division.

July 6, 1979.

Patrick E. Morgan, Louisville, Ky., for plaintiff.

W. Scott Miller, Jr., Louisville, Ky., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN, Chief Judge.

This action is submitted to the Court for a decision on the merits after a trial which lasted one and one-half days.

Plaintiff brought its action praying for damages in the amount of $29,484.53, plus interest from May 8, 1974. The complaint is predicated on an alleged breach of defendant's duty to pay plaintiff a balance of $8,314, and on the claim, under the terms of the contract, which specified a total payment of $27,552. It is stipulated by the parties that $19,238 has been paid under the terms of the contract.

Plaintiff also alleges that he relied upon the assurances of defendant that an additional four to five powder dumping machines would be purchased, and that he spent $48,244.53 in reliance upon these promises and to fulfill his contractual agreement to furnish one powder dumping machine to the defendant.

Defendant filed an answer and counter-claim stating, in substance, that the plaintiff failed to properly install and equip the powder dumping machine, and that, as a result thereof, it was compelled to expend $10,147.46 in order to replace defective parts and materials.

The evidence produced by the parties reveals that they originally agreed upon a contract of $24,818 for the purchase of the powder dumping machine, and its delivery to the defendant in Indiana. Subsequently, because of costs incurred as a result of inflation, the parties agreed to a modification of the contract, which then provided that defendant would pay plaintiff $27,552. It should be noted that the contract was entered into pursuant to a competitive bid made by the plaintiff following the submission to him and other parties of what was known as the specification for a powder dumping system dated March 26, 1973. When plaintiff bid on the specifications, it separated its bid into four components, which were as follows:

1. Design, Completion, Review, ICIA Approval — $9,870.
2. Purchase, Building and Demonstration — 8,780.
3. Ship and Install — 3,728.
4. Acceptance Test and Completion of Project — 2,440.

Plaintiff, in May and June, 1974, completed the first two components set out above. In May, 1974, it demonstrated the system to defendant's representatives in Louisville, and after receiving their suggestions and comments, modified the system accordingly, and again showed the system to defendant's representatives in Louisville in June. At that time the system was approved for shipping to Indiana, and the shipping took place on June 1, 1974, plaintiff having sent its truck and one employee to the plant of the defendant.

At this point the evidence produced by the parties takes widely divergent paths. Plaintiff's evidence is to the effect that it

sent Earl Martin, a mechanic, to defendant's plant, along with one other mechanic, to install the machine under the directions of Charles Troutman, an employee of the defendant. Plaintiff admits that Martin and the other mechanic were at the defendant's plant on 8 or 9 occasions in June, 1974, in order to help with the installation of the system.

It further appears from plaintiff's evidence that Earl Martin was dispatched to the defendant's plant in October, 1974, and that the alleged reason for his being there was to help the defendant with problems which had arisen concerning a hydraulic pump. Plaintiff's evidence is to the effect that the hydraulic pump burned out because of improper use by the defendant, to wit: the furnishing of oil which was not the type of oil which should have been used in the machine. Defendant counters this argument by stating that the machine, as originally designed, contained oil which was combustible and in violation of safety regulations which were called for in the contract.

James Thaler, the president of the plaintiff company, testified that finally, in January, 1975, since no payment had been received on the $8,314 balance owing to his company, he wrote a letter demanding payment of that amount. Defendant responded by a letter dated January 25, 1975, the substance of which was that some specified defects existed in the system and that these defects had been remedied by the defendant at a cost of $4,805.84, and that defendant offered in payment to plaintiff the balance owing on the contract price of $8,314, minus the $4,805.84 for back charges, resulting in a net amount of $3,509, for which defendant enclosed its check. Plaintiff refused to cash the check, taking the position which it has maintained throughout this case, that it was entitled to the balance of $8,314.

It is undisputed that plaintiff was never formally notified that there was a default in the contract or a breach of warranty, but defendant consistently maintains that it discovered many defects in the system upon its arrival, and that finally, in the fall of 1974,

Mr. Page, its purchasing agent, discussed the matter with James Thaler and obtained his approval to correct the defects in the system and to back charge the expenses of the corrections to plaintiff. No written documents or memoranda were kept by Page or any other employee of defendant to substantiate their testimony that Thaler had agreed to have defendant repair the defects and back charge him for the reasonable costs of repairs.

The parties have stipulated that the Court should decide the case by applying Kentucky law. They are also in agreement that the Uniform Commercial Code, which has been adopted by Kentucky, governs the conduct of the parties and the results of this case. Plaintiff contends that it is entitled to judgment on the $8,314 claim, because it attached to its bid a warranty statement which, in part, is as follows:

> "No allowance will be granted for any repairs or alterations made by Purchaser or at Purchaser's direction without Company's written consent, and no claims for labor or consequential damages or any other damages to persons or property will be allowed."

Plaintiff contends that since there is no writing between the parties relating to the question of repairs or alterations, that this warranty controls. Plaintiff points to UCC Sec. 2–207 which is as follows:

> "UCC 2–207(1), a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

> "(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants, such terms become a part of the contract unless: (a) [t]he offer expressly limits acceptance to the terms of the offer; (b) [t]hey materially alter it; or (c) [n]otification of objection to them has already been given or is given within a reasonable time after notice of them is received."

Comment (3) to the above provisions of UCC Sec. 207(1) and (2) is, in pertinent part, as follows:

"Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain, they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time."

The defendant relies upon a document entitled "Terms and Conditions" which was submitted with the specifications and which provides, in substance, that no agreement modifying the conditions of the purchase order are binding upon the buyer unless made in writing and signed by buyer's authorized representatives. Plaintiff responds that defendant signed the purchase order dated April 9, 1973, which states that "the purchase order is written for the purpose of purchasing one dumping system in accordance with specifications given for the powder dumping system, dtd. 26 March 73 and in accordance with your quotation dated 26 April 73 (sic) incorporated in Inquiry WNG 30861." Nothing else is said in the purchase order relative to the terms and quotations attached to plaintiff's bid.

The terms incorporated by plaintiff in its bid were additional to the terms contained in the specifications submitted by the defendant. They covered a subject on which the proposal was silent, that is, the conditions under which defendant could repair defective parts within the warranty period. We believe that defendant accepted these additional conditions imposed by the plaintiff when it executed its purchase order and specifically stated that its purchase order was in accordance with the quotations dated April 26, 1973. We further believe that a contract was formed by the specifications and inquiries submitted to plaintiff by defendant, plaintiff's quotations and defendant's purchase order. See *Lincoln Pulp & Paper Company, Inc. v. Dravo Corp.,* 445 F.Supp. 507 (D.Maine 1977), and *Coast Trading Company, Inc. v. Parmac, Inc.,* 21 Wash.App. 896, 587 P.2d 1071 (1978).

Plaintiff further asserts that defendant did not notify it of any breach of warranty and that, therefore, it is in violation of UCC 2–607(3)(a) which is as follows:

"The Buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

We believe that the answer to both of these arguments made by plaintiff is found in the case of *Standard Alliance Industries, Inc. v. Black Clawson Company,* 587 F.2d 813 (6th Cir. 1978). There the court held that, although the seller had knowledge that its machine was not in compliance with the performance warranties, and although it spent five months trying to fix the machine, it had no knowledge after its employees left seller's place of business when they quit repair work that it was considered to be in breach of the repair or replacement warranty. The evidence showed that the buyer did quit repair work on June 21, 1968 and was never told that anything was wrong until May 29, 1969, when suit was filed. The Sixth Circuit held that notice should have been given of the breach, and that the notice need be only such as informs the seller that the transaction is claimed to have involved a breach. The court further held that failure to give notice precluded the settlement of the dispute through negotiations, and also prevented the seller from having ample opportunity to cure the defect, investigate the claim of the buyer, or do whatever was necessary to properly defend himself or minimize his damages while the facts were fresh in the minds of the parties. See 587 F.2d at p. 826.

Here there is no proof that defendant, either in writing or orally, formally advised plaintiff that it had breached its warranty under the contract. However, our attention is also called to another principle which was discussed by the *Standard Alliance Industries, supra* court with regard to back

charges. The contract provided, in substance, that any corrective work done by the buyer for the account of the seller should not be done until after full particulars, including an estimate, had been submitted in writing to and approved in writing by the seller. The court found that the parties made an express oral modification which operated as a waiver of Black Clawson's rights under that section of the contract, and the evidence of plaintiff was that its man-in-charge and an employee of defendant had agreed that plaintiff would keep a running total of expenses incurred while the machine was being worked on. Memoranda authored by a Black Clawson executive supported this testimony.

The Sixth Circuit held that it made good sense for plaintiff to keep a running tab on the back charges instead of continually going to defendant for written approval, and that unchallenged ledger entries kept pursuant to the oral agreement between the parties was sufficient to entitle it to a 100% recovery of these back charges. In the instant case, however, the proof is diametrically opposed as to whether there was any oral agreement for defendant to do the repairs and to keep a running account of its expenses incurred in so doing. Therefore, defendant has failed to meet the burden of proving by clear and convincing evidence that the written contract was orally modified to allow defendant to make the repairs and back charge the plaintiff for them.

Under Kentucky law, as enunciated in *National Union Fire Insurance Company v. Duvall,* 268 Ky. 168, 104 S.W.2d 220 (1937) and *Glass v. Bryant,* 302 Ky. 236, 194 S.W.2d 390 (1946), the burden of proof on the parties seeking to orally modify a written contract is that of clear and convincing proof. See, also, *Standard Alliance Industries, Inc. v. Black Clawson Company, supra,* applying Ohio law to the same effect.

Summarizing our conclusions to this point, we find that defendant did not comply with either the written provisions contained in the warranty made by the plaintiff or the provisions of UCC Sec. 2–607(3). We also find that the proof is not clear and convincing that plaintiff waived its rights under the contract or under the statute by orally agreeing to defendant's keeping a running tab on the back charges.

Judgment, therefore, must be entered for plaintiff in the amount of $8,314, together with interest at the rate of 6% from August 1, 1974 until June 19, 1976, at which time K.R.S. 356.040 was amended to provide for interest upon liquidated judgments at the rate of 8%. This, of course, is a case which involves liquidated damages and plaintiff, therefore, is entitled to the full 8% rate accruing after June 19, 1976.

Plaintiff contends, however, that it is entitled not only to the $8,314 with interest but that defendant is bound to pay it for all of its expenditures incurred in connection with the production of the powder dumping system, on the theory that defendant assured it that it would purchase other powder dumping machines. The proof on this point is rather brief. The parties are agreed that plaintiff took a loss on the contract. Mr. Thaler testified that he was advised that other machines would be ordered from him but he offered no proof as to how many machines, what the date of delivery would be, what the price would be, or any other details concerning the alleged contract that would be entered into. He did produce as an exhibit a document entitled "Production, Support and Fixtures Project RCSGSGLD 1124" which states in pertinent part:

"This piece of equipment is the first of several planned in developing a fully automatic remote control operation. The ultimate object is to remove all people from direct exposure to Class 7 propellant."

Mr. Thaler also testified that a gentleman, who he identified as being in charge of the plant, wanted three more machines. There is undisputed evidence to the effect that defendant, before entering into any contract in excess of $25,000, had to secure the approval of the United States Army. Also, the evidence conclusively shows that before

entering into any contracts with plaintiff, defendant had, during several years of dealing with him, always submitted written proposals and received written response before entering into contracts.

It is obvious also from the proof that plaintiff sustained a loss under the contract to sell one powder dumping machine to the defendant, where the price was in excess of $25,000. It seems apparent, although not beyond doubt, that the purchase of three or more powder dumping machines would have involved more than $25,000.

█ It is, therefore, the conclusion of the Court that no contract was entered into between plaintiff and defendant for the purchase of three or more powder dumping systems or machines. So much of plaintiff's complaint as seeks damages in that regard is without merit.

The Court has this day entered its judgment in accordance with this opinion.