## 72233. FRANKLIN v. DEMICO, INC.

(347 SE2d 718)

DEEN, Presiding Judge.

Defendant Franklin appeals from a bench trial judgment for plaintiff Demico. Enumerated as error are Demico's failure to meet the burden of proof as to damages and the refusal of the trial court to direct a verdict for Franklin predicated on the same gap in the establishment of a prima facie case. Where there is a bench trial, technically a motion for directed verdict does not lie. Instead, it is treated as a motion for involuntary dismissal under OCGA § 9-11-41. *Kennery v. Mosteller*, 133 Ga. App. 879, 880 (212 SE2d 447) (1975).

Demico filed suit on an account. However, as the factual situation unfolded it became apparent that the action was somewhat more complex than a mere open account and involved breach of contract. Demico was in the business of providing customized electronic components to its customers, to whom they were proprietary. Python Corporation was producing energy-saving devices. Demico entered into an agreement whereby it would furnish Python with electronic circuit boards (PA-2's and PAC's) to meet certain specifications. Since Python was a new corporation of uncertain credit ability, Franklin, its president, agreed to guarantee payment. The orders for the circuit boards were modified by mutual agreement and as finalized were basically for 1,000 PA-2 boards at $44 each and 1,000 PAC boards at $36 each. Delivery of the boards was scheduled over a year's period in quantities of 50 to 100 per month.

The agreement was documented in letters, purchase orders, conversations, and the "Demico Blanket Order Policy." As stated therein, it was based on the principle that a blanket order for a large quantity by a customer permitted Demico to order parts in quantity at a fixed schedule and thereby save substantially, permitting it to offer its products at lower prices. Increases and decreases in volume and scheduling which naturally affected the prices charged were handled by two provisions in the blanket order policy. Under the first

provision, if the item was developed using off-the-shelf components (readily available from vendors), increases in volume would take effect 90 days from a replacement purchase order. On the other hand, orders could be lowered or stopped by giving 90 days' written notice and receiving the scheduled shipment for 90 days, in which case there would be a "bill back" at the time of the change to reflect the higher quantity price for the aggregate per quote. Presumably, for example, if an item offered at $50 for an order of 1,000 was then reduced to 500 items at which the price was $60 apiece, then the customer would be "billed back" the difference of $10 per item for the total amount of items under the revised order.

Under the second provision, where special parts were utilized which were not available on the open market, "a clause shall be incorporated to provide options to make program changes, a scheduled slowdown, and a scheduled shutdown. The contract shall provide that our client is liable for proprietary parts that are in process by our vendors." Python and Franklin agreed to the policy.

Almost immediately Python began to experience financial difficulties and after the initial shipments did not make timely payments. Python paid $10,025 to Demico for boards shipped to it. Three invoices were not paid, although promises to pay were made, and these three invoices formed the basis for the complaint. At trial Python admitted owing the one for $2,202.48, which represented 50 shipped PA-2 boards.

The dispute, then, revolves around the other two invoices, one for $4,400 for the balance of the PA-2 order not shipped and one for $21,420 for the balance of the PAC's ordered but not shipped. These invoices represent what Demico's president called "billbacks" and are described as constituting Demico's loss resulting from Python's failure to honor its full order. Python notified Demico to cease production of the PA-2's on December 7, 1983, triggering the $4,400 invoice. Python never advised Demico to stop buying parts for and working on the PAC's, but Demico did so because of the slow payments; Python never sought shipment of those portions of its order. After Python ceased operating, Demico sent an invoice in connection with the 850 PAC's remaining on that order. The amount billed was $21,420, based on a calculation of 70% of the original price of $36 each for the 850 PAC units. The invoice contained an explanation that 62 units were "in work," 788 units had "parts in house," and the sum was for "parts and work in process, overhead and profit."

At trial, Demico was required to prove its damages with reasonable certainty. *Crosswell v. Arten Constr. Co.*, 152 Ga. App. 162, 166 (3) (262 SE2d 522) (1979). We must determine whether this was accomplished.

1. Of first priority is that we ascertain the correct measure of

damages applicable to this case. Since the sale of goods was involved, we turn to the provisions of the UCC found in OCGA Title 11, especially OCGA §§ 11-2-703 through 710, setting out seller's remedies for buyer's breach of a sales transaction.

Demico's action by its very nature is not one for the price under OCGA § 11-2-709. Thus, OCGA § 11-2-708 would control. Because the items involved were unique so that no market existed, OCGA § 11-2-708 (2) rather than (1) would be applicable. See *Copymate Marketing v. Modern Merchandising*, 34 Wash. App. 300 (660 P2d 332) (1983); *Bead Chain Mfg. Co. v. Saxton Prods.*, 183 Conn. 266 (439 A2d 314) (1981). If the measure of damages under UCC § 2-708 (1) is inadequate to put the seller in as good a position as if the contract had been fully performed, then the damages are as prescribed by (2). *TCP Indus. v. Uniroyal*, 661 F2d 542 (6th Cir. 1981); *Coast Trading Co. v. Parmac, Inc.*, 21 Wash. App. 896 (587 P2d 1071) (1978). The damages included in OCGA § 11-2-708 (2) are: "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in [OCGA § 11-2-710], due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." OCGA § 11-2-710 defines "incidental damages" as: "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care, and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

OCGA § 11-2-708 (2) is designed to encompass the situation, as here, where the seller learns of the buyer's breach while still engaged in manufacturing the goods. "Generally in such cases, the measure of the seller's damages has been stated to be the difference between the contract price and the cost of production of the goods, or, as it has also been stated, the difference between the contract price and the cost of performance of the contract . . . Where the contract to manufacture or produce goods is partly performed before the breach, with the resultant expenditure of labor and materials, this fact must be taken into consideration. The seller is entitled to recover damages directly and naturally resulting from the breach, including compensation for goods manufactured which the buyer did not accept, and compensation for material, labor, and expense for goods in the course of manufacture, and for loss of profits, subject to deduction for the salvage value of the labor and materials furnished or the value which the goods in the process of manufacture might have." 67A AmJur2d 516, Sales, § 1126.

This rule is remarkably similar to the measure of damages between a building contractor and a homeowner where the owner breaches the construction contract. In such case, the basic component

of damages is the "net profit to which the contractor would have been entitled had full performance of the contract been permitted. That figure is reached by subtracting from the contract price the amount which full performance would have cost the contractor. If performance by either party had begun prior to the breach, adjustments must be made to ensure that the contractor receives the full amount of the profit, but no more. First, there must be added to the profit figure the amount of the contractor's net loss up to the point of the breach. That figure is reached by subtracting from the expenses incurred by reason of the contractor's performance the salvage or resale value of the material left on hand. The sum of those figures (the profit which would have been realized from full performance plus net loss incurred by performance to the date of breach) may in no event exceed the contract price. Second, there must be deducted from the recovery those amounts received by the contractor from the owner as prepayment or progress payment." *Williams v. Kerns,* 153 Ga. App. 259, 266 (265 SE2d 605) (1980); *McDaniel v. Green,* 156 Ga. App. 549, 552 (3) (275 SE2d 124) (1980). See *Murray v. Americare Med. Designs,* 123 Ga. App. 557, 559 (3) (181 SE2d 871) (1971); *Crankshaw v. Stanley Homes,* 131 Ga. App. 840, 841 (1) (207 SE2d 241) (1974).

2. The question remains whether, under the principles outlined in Division 1, supra, plaintiff sufficiently established its right to recover, and if so, in what amount. We find that the evidence clearly establishes a contractual breach and a resulting right to damages. Moreover, Demico's president explained how he arrived at the sum sought. Accompanying his testimony was a summary indicating how the various figures were derived. Initially, the total of each contract was considered: $44,000 for the PA-2s and $36,000 for the PACs. The total was erroneously listed on the summary as $81,000. From this was deducted the $10,025 orders shipped and paid for by Python, and the $2,202.48 order shipped and concededly owed but not paid for. This left the unshipped portion of the orders as the basis, at the agreed contract price. According to the president, all of the parts had been purchased by Demico to meet the scheduling agreed upon, but credit was given to Python for all parts the purchase of which could be cancelled and for all parts which could be used for other purposes. The work in progress on the remainder of the two orders, including materials and labor, and the various stages of completion of unshipped units, which could not be sold because of Python's proprietary interest in them, was included in the calculation so as to determine the loss. As to the PAC's, according to the invoice, 62 of the units were "in work," and parts had been purchased for 788 of the units. Nothing was said about the status of the PA-2 boards. Demico's president testified that to those figures overhead was added, plus 15% for lost profit.

There is no merit in Franklin's argument that the amount is not proved because it includes profits, which must be shown with a requisite degree of certainty. See, e.g., *Levy Bros. v. Allen,* 53 Ga. App. 246 (185 SE2d 369) (1936). Franklin is confusing the legal concepts appropriate to profits which might accrue collaterally as a result of the contract's performance and profits necessarily inherent in the contract, which are always provable. 22 AmJur2d 93, 246, Damages, §§ 62 and 174. See the cases cited in Division 1 of this opinion.

Although we acknowledge that, as the dissent contends, the complex and confusing mathematical methodology used in this case does not produce exact arithmetical accuracy, we must nevertheless presume that the trial judge, as trier of the facts, separated the wheat from the chaff. The evidence appears to support the judgment in the amount of $29,820, this figure being generally within the range of the evidence presented.

*Judgment affirmed. Banke, C. J., Birdsong, P. J., Sognier, Pope and Benham, JJ., concur. McMurray, P. J., Carley and Beasley, JJ., dissent.*

BEASLEY, Judge, dissenting.

This case does not involve several witnesses giving their opinion as to various amounts of damages; so there is no basis to affirm the findings of fact as being within the range of evidence. Instead there is one witness giving his testimony as to damages and the issue is simply whether that testimony was sufficient to sustain the amount awarded. Our determination involves the correct measure of damages which the majority opinion has accurately stated. The disagreement arises from the majority's summary application of those principles to the instant facts.

Having essentially laid the foundation for the recovery of damages resulting from the breach, plaintiff needed only to attach some relevant figures regarding the costs of production and costs of material purchased, less the amounts received from salvage or other utilization of such materials, but it did not do so. Instead, Demico then attempted to take a percentage of the balance remaining of the unpaid order, which the summary listed incorrectly as $68,772.52 (it should have been $67,772.52). The figure utilized was 62-½% by which the $68,772.52 was "discounted" to arrive at the sum of $25,820 owed from the remainder of both orders which coincidentally was the same figure reached by taking 70% of 850 PAC units at $36 per unit and adding $4,400 for PA-2 units.

The difficulty with this approach is that the percentages offered demonstrated no relation to the damages Demico suffered other than as unexplained approximation. Unfortunately, there is no discernible reason for using 70% of one order or a discount of 62-½% of the

entire order. Any other percent could just as easily have been used with the same justification because the evidence here provides no grounds for the purely arbitrary percentage selected.

Moreover, it is clear plaintiff was using one measure when it invoiced the defendant and another measure when it actually tried to establish damages. Evidently the purpose was to arrive at a certain predetermined figure, $25,820.

In this case, as in others, the plaintiff need not establish his damages with mathematical precision. What must be done, however, is that the numbers must bear some relation to the proper measure of damages where, as here, the plaintiff either from choice or necessity did not proceed under the contract but sought recovery as provided by law.

I would reverse for consideration of the proper amount of damages.

I am authorized to state that Judge Carley joins in this dissent.

DECIDED JULY 15, 1986.

*Charles F. Reeves*, for appellant.
*John H. Watson, Frederick Warren III*, for appellee.